# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Kyle Pertuis, Respondent,

v.

Front Roe Restaurants, Inc., Beachfront Foods, Inc., Lake Point Restaurants, Inc., Mark Hammond and Larkin Hammond, Petitioners.

Appellate Case No. 2016-000749

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Greenville County
Edward W. Miller, Circuit Court Judge

---

Opinion No. 27823
Heard November 14, 2017 – Filed July 5, 2018

---

## REVERSED IN PART, VACATED IN PART, AND AFFIRMED AS MODIFIED IN PART

---

Blake A. Hewitt, of Bluestein Thompson Sullivan, LLC, of Columbia and Curtis Stodghill, of Stodghill Law Firm, of Greenville, for Petitioners.

Robert C. Wilson, Jr., of Greenville, for Respondent.

---

**ACTING CHIEF JUSTICE KITTREDGE:** Petitioners Mark and Larkin

Hammond built and operated several successful restaurants in Lake Lure, North Carolina, and Greenville, South Carolina. The Hammonds hired Respondent Kyle Pertuis to manage the restaurants, and as part of his compensation, Pertuis acquired minority ownership interests in the three restaurants. Pertuis eventually decided to leave the business, and this dispute primarily concerns the percentage and valuation of Pertuis's ownership interests in the three restaurants. Following a bench trial, the trial court found the three corporate entities should be amalgamated into a "de facto partnership" operating out of Greenville, South Carolina. The trial court further awarded Pertuis a 10% ownership interest in the two North Carolina restaurants, a 7.2% ownership interest in the South Carolina restaurant, and a total of $99,117 in corporate distributions from the restaurants. The trial court further concluded Pertuis was an oppressed minority shareholder, valued each of the three corporations, and ordered a buyout of Pertuis's shares. The court of appeals affirmed. *Pertuis v. Front Roe Restaurants, Inc.*, Op. No. 2016-UP-091 (S.C. Ct. App. filed Feb. 24, 2016). For the reasons explained below, we reverse in part, vacate in part, and affirm as modified in part.

## I.

The Hammonds, who are residents of Lake Lure, North Carolina, formed Lake Point Restaurants, Inc. (Lake Point), a North Carolina S-corporation, in 1998 and purchased a restaurant on the water at Lake Lure, North Carolina. The Hammonds were the sole shareholders with equal ownership in the corporation. The restaurant purchase was financed through personal contributions by the Hammonds, owner-financing, and third-party loans personally guaranteed by the Hammonds. The business operated as Larkin's on the Lake and remains a viable business today.

In 2000, the Hammonds hired Pertuis as a manager of the restaurant. As part of Pertuis's compensation package, the parties agreed Pertuis would earn a base salary plus bonuses based on profitability benchmarks, along with a 10% share in the business over the course of a five-year period at an agreed vesting schedule. The vesting schedule was time-based to incentivize Pertuis to remain with the company for a period of time. In accordance with the vesting schedule, by 2007, Pertuis owned a 10% share in Lake Point.

In 2001, the Hammonds formed Beachfront Foods, Inc. (Beachfront), which was also a North Carolina S-corporation, for the purpose of purchasing another restaurant on Lake Lure. As with Lake Point, the Hammonds were the sole shareholders with equal ownership interests; the restaurant purchase was financed

through personal contributions by the Hammonds, owner-financing, and third-party loans personally guaranteed by the Hammonds; and the parties agreed upon a five-year vesting schedule for Pertuis to attain a 10% ownership interest.  The second restaurant was renovated and re-branded as MaLarKie's, which represented a combination of the parties' first names—Mark Hammond, Larkin Hammond, and Kyle Pertuis.  When Beachfront was formed, Pertuis's job title became "Managing Partner," as his duties included oversight of both restaurants.  Along with the increase in job duties, Pertuis's compensation expanded.  Also as with Lake Point, by 2007, Pertuis owned a 10% share in Beachfront.  For various reasons, MaLarKie's was not as successful as Larkin's on the Lake, and eventually Beachfront sold MaLarkie's and began operating a casual dining restaurant in nearby Columbus, North Carolina.  This restaurant, Larkin's Carolina Grill, was the least profitable of the three restaurants at the time of trial, with a negative net income reported on its income tax returns each year from 2008–2012.

In 2005, the Hammonds formed Front Roe Restaurants, Inc. (Front Roe), a South Carolina S-Corporation and purchased Rene's Steakhouse in Greenville, South Carolina.  As with the other two corporations at the time of their formation, the Hammonds were the sole shareholders of Front Roe with equal ownership interests, and the restaurant purchase was financed through personal contributions by the Hammonds and third-party loans personally guaranteed by the Hammonds.  The business currently operates as Larkin's on the River and, at the time of trial, was the most profitable of the three corporations.

Several months after Front Roe was formed, Pertuis moved to Greenville and traveled to each of the restaurants weekly as part of his managerial duties.  Although the parties agreed upon a vesting schedule for Pertuis to acquire up to a 10% interest in Front Roe, by all accounts this agreement, unlike the others, was based upon the restaurant's profitability benchmarks rather than length of service.  Although none of the parties could produce a written vesting schedule, Mark Hammond testified the agreement was for Pertuis to receive a 1% interest the year Front Roe first became profitable and an additional 9% once the company achieved a net operating profit of $500,000.

By 2007, Pertuis owned a 1% share of Front Roe; however, both Hammond and Pertuis agreed that, at the time of trial, Front Roe had never reached the $500,000 profit benchmark.  This fact is confirmed by Front Roe's tax returns.  Pertuis has never made any capital contributions or personal loans to the companies, either during or after his employment.

By late 2008 to early 2009, the parties began discussing different compensation packages to allow Pertuis to reach a 10% ownership interest in Front Roe. Despite multiple conversations back and forth between Pertuis and Hammond, and the involvement of attorneys and tax professionals, Pertuis eventually became frustrated with the perceived delay in the process of formalizing what he hoped would be a new agreement. In early October 2009, Pertuis took some time off from the business to consider his options. In a lengthy email to the Hammonds, Pertuis cited the sources of his discontent as, among other things, feeling like his investment of time and energy into the business was not paying off financially, industry burnout, and trouble achieving work-life balance. Ultimately, the parties split ways, although it is unclear from the record whether the decision was Pertuis's, the Hammonds', or a mutual one.

After the parties' unsuccessful attempts to negotiate the Hammonds' purchase of Pertuis's shares of the businesses, which was exacerbated by disagreements over the value of Pertuis's shares and the extent to which Pertuis was entitled to certain business records, suit was filed.[1] Essentially, Pertuis argued he was an oppressed minority shareholder who had been "squeezed out" of the business in bad faith and that he was therefore entitled to a forced buyout of his shares, including a 10% ownership share in Front Roe.

Following a bench trial, the trial court found the three corporate entities—Lake Point (NC), Beachfront (NC), and Front Roe (SC)—should be amalgamated into a single business enterprise located in and operating out of Greenville, South Carolina. The trial court further found Pertuis was an oppressed minority shareholder and awarded Pertuis a 7.2% ownership interest in Front Roe, as well as $99,117 in unpaid corporate distributions from Lake Point and Front Roe. The trial court valued each of the three corporations and ordered a buyout of Pertuis's

---

[1] This lawsuit was initially filed by Front Roe as a declaratory judgment action, seeking a declaration that it did not have to turn over its corporate records to Pertuis without some sort of protection against the risk Pertuis might divulge confidential or "proprietary" information contained therein. Thereafter, Pertuis filed counterclaims and third-party claims; as a result, the parties were realigned, and the caption was changed to its current form.

shares by Petitioners.[2]  The court of appeals affirmed.  *Pertuis v. Front Roe Restaurants, Inc.*, Op. No. 2016-UP-091 (S.C. Ct. App. filed Feb. 24, 2016).  This Court issued a writ of certiorari to review the court of appeals' decision.

Petitioners now argue the court of appeals erred in affirming the trial court's finding that the three corporations operated as a single business enterprise with its locus in Greenville and that the court of appeals erred in finding this argument to be unpreserved.  Petitioners also contend the court of appeals erred in affirming the trial court's decision to award a 7.2% ownership interest in Front Roe and $99,117 in shareholder distributions to Petitioner; in valuing Beachfront at $0 rather than assigning it a negative value; and in finding Pertuis was an oppressed minority shareholder.

## II.

An action for stockholder oppression is one in equity.  *Ballard v. Roberson*, 399 S.C. 588, 593, 733 S.E.2d 107, 109 (2012) (citation omitted).  Therefore, this Court may find facts according to its own view of the evidence.  *Id.* (citing *S.C. Dept. of Transp. v. Horry Cty.*, 391 S.C. 76, 81, 705 S.E.2d 21, 24 (2011)).

### A.  Amalgamation or Single Business Enterprise

Petitioners claim the court of appeals erred in affirming the trial court's finding that amalgamation of the three corporate entities was warranted.  We agree.[3]  However,

---

[2]It was unclear from the trial court's order whether the buyout of Pertuis's shares was to be by the Hammonds or the corporate entities.  *See* N.C. Gen. Stat. § 55-14-31(d) (allowing a corporate entity to repurchase the shares of an oppressed minority shareholder to avoid the harsh remedy of judicial dissolution); S.C. Code Ann. § 33-18-420(a) (allowing similar purchase by either the corporation or one or more of its shareholders).

[3] The court of appeals erred in concluding this issue was not preserved for appellate review; further, it was an abuse of discretion for the court of appeals to raise this issue *sua sponte* then to deny Petitioners' request to supplement the record with materials in response to the court of appeals' questions at oral argument, particularly where counsel for Pertuis conceded the Hammonds' challenge was preserved.  "Judicial economy is not served when a case, ripe for

before we reach the merits of this claim, we must first sort through the complicated issue of whether South Carolina or North Carolina law governs our evaluation of this veil-piercing theory.

## 1. Choice of Law

At the outset, we acknowledge the trial court's finding that these three entities should be amalgamated into a single business enterprise with its locus in Greenville, South Carolina, is foundational to the consideration of all the remaining issues, including the issues of shareholder oppression, Pertuis's ownership percentages, and valuation issues. However, because Lake Point and Beachfront are North Carolina corporations that are not registered to do business in South Carolina, and based on the record, do not, in fact, conduct business in South Carolina, this preliminary issue presents a vexing choice of law question as to whether South Carolina or North Carolina law governs our inquiry.

---

decision, is decided on a procedural technicality of this nature. In the interests of justice and fair play, cases should be decided on the merits when deficiencies of this nature can be easily corrected." *Silk v. Terrill*, 898 S.W.2d 764, 766 (Tex. 1995) (citation omitted) (finding an intermediate appellate court abused its discretion in denying a party's motion to supplement the record then concluding the resulting insufficiencies in the record procedurally barred the substantive consideration of the legal issues where the omitted documents had not previously been at issue and the appellate court was not in any way misled or its decision hindered or delayed); *see also Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012) (expressing concern about the "over-zealous application" of "long-standing error preservation rules" and discouraging a "hypertechnical application" of those rules resulting in appellate arguments being procedurally barred); *Herron v. Century BMW*, 395 S.C. 461, 465, 719 S.E.2d 640, 642 (2011) ("Issue preservation rules are designed to give the trial court a fair opportunity to rule on the issues, and thus provide us with a platform for meaningful appellate review . . . . Imposing such a requirement on the appellant is meant to enable the lower court to rule properly after it has considered all relevant facts, law, and arguments." (quotation marks and citations omitted)); *Wilder Corp. v. Wilke*, 330 S.C. 71, 77, 497 S.E.2d 731, 734 (1998) (citation omitted) ("Post-trial motions are not necessary to preserve issues that have been ruled upon at trial; they are used to preserve those that have been raised to the trial court but not yet ruled upon by it.").

"The choice of law rule generally applied to corporate law issues is the internal affairs doctrine, which provides that the internal matters of corporate governance are governed by the law of the state of incorporation." 1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 43.72 (perm. ed., rev. vol. 2015). The "internal affairs" of a corporation consist of "the relations inter se of the corporation, its shareholders, directors, officers or agents." Restatement (Second) of Conflict of Laws § 302 cmt. a (1971). "States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care." *Atherton v. F.D.I.C.*, 519 U.S. 213, 224 (1997) (citation omitted).

In South Carolina, our Legislature has made clear that this state is "not authorize[d]" to "regulate the organization or internal affairs of a foreign corporation" even if the corporation *is* registered to conduct business in South Carolina, which Lake Point and Beachfront are not. S.C. Code Ann. § 33-15-105(c) (2006); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) (citation omitted) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.").

That being said, although "[v]eil piercing cases implicate corporate law[, they] involve disputes that reach beyond the confines of the corporation." 1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corporations* § 43.72 (perm. ed., rev. vol. 2015). Indeed, this threshold amalgamation issue is not as much a question of the inner-workings of foreign corporations as it is an assessment of whether these entities actually operate as a single business enterprise, and thus should be treated as a single entity. Further, one of the three corporate entities, Front Roe, is a South Carolina corporation; much of the conduct at issue occurred, at least in part, in South Carolina; and Pertuis, the minority shareholder, is a South Carolina resident. Accordingly, we conclude the application of South Carolina law is appropriate and that the internal affairs doctrine does not bar our review of this issue. *See TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 65 (D.D.C. 2011) (explaining that resolving choice-of-law issues in veil-piercing cases involves an evaluation of the governmental policies underlying the conflicting laws and a determination of the extent to which a jurisdiction's policies would be advanced by having its law applied to the facts of the case under review); *cf. Robinson v. Estate of Harris*, 388

S.C. 645, 656, 698 S.E.2d 229, 236 (2010) ("Courts have the inherent power to do all things reasonably necessary to ensure that just results are reached to the fullest extent possible." (quotation marks and citation omitted)). Having determined South Carolina law governs our evaluation of the amalgamation claim, we turn now to the merits.

*2. Amalgamation or Single Business Enterprise Theory*

The amalgamation of interests theory was first recognized in South Carolina by the court of appeals in *Kincaid v. Landing Development Corp.*, 289 S.C. 89, 344 S.E.2d 869 (Ct. App. 1986), which involved three related corporations (a development corporation, a management corporation, and a construction corporation) that were sued for negligent construction and breach of warranty. The management corporation argued it was entitled to a directed verdict in its favor because it was merely the marketing and sales company; however, the record in *Kincaid* revealed that, in addition to sharing owners and corporate officers, the three companies shared a location, all companies were overseen by the management company, and business letterhead identified the management company as "A Development, Construction, Sales, and Property Management Company." *Id.* at 96, 344 S.E.2d at 874. Based on that evidence, the court of appeals affirmed the trial court's finding that the corporate entities were properly regarded as a single entity because the evidence at trial showed "an amalgamation of corporate interests, entities, and activities so as to blur the legal distinction between the corporations and their activities." *Id.* (quoting the trial court order).

Subsequently, this so-called amalgamation of interests theory was briefly referenced (but not examined) by this Court in *Kennedy v. Columbia Lumber and Manufacturing Co.*, 299 S.C. 335, 340–41, 384 S.E.2d 730, 734 (1989) (noting a "lender may be liable if it is so amalgamated with the developer or builder so as to blur its legal distinction." (citing *Kincaid*, 289 S.C. 89, 344 S.E.2d 869)). And it was also addressed in *Mid-South Management Co. v. Sherwood Development Corp.*, in which the court of appeals found the theory did not apply to the facts of that case because there was no evidence in the record that the corporate entities' identities or interests were blurred or could be confused with one another. 374 S.C. 588, 605, 649 S.E.2d 135, 144–45 (Ct. App. 2007) (per curiam). Most recently, the amalgamation theory was addressed by the court of appeals in a pair of construction defect cases—*Magnolia North Property Owners' Association v. Heritage Communities, Inc.*, 397 S.C. 348, 725 S.E.2d 112 (Ct. App. 2012), and *Pope v. Heritage Communities, Inc.*, 395 S.C. 404, 717 S.E.2d 765 (Ct. App.

2011).[4]

The parties have not cited, and our research has not found, a decision of this Court examining the amalgamation of interests theory in detail. However, under this theory, as it has been recognized in other states,[5] where multiple corporations have

---

[4] This Court dismissed certiorari as improvidently granted in both those cases on September, 30, 2015—just two weeks before the oral argument before the court of appeals in this case. *See Magnolia North Prop. Owners' Ass'n v. Heritage Communities, Inc.*, 414 S.C. 198, 777 S.E.2d 831 (2015), and *Pope v. Heritage Communities, Inc.*, 414 S.C. 199, 777 S.E.2d 832 (2015).

[5] *See Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249–50, 1 Cal. Rptr. 2d 301, 301 (Ct. App. 1991) ("Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies. The theory has been described as follows: In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise; and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it." (quotations and citation omitted)); *Green v. Champion Ins. Co.*, 577 So. 2d 249, 257 (La. Ct. App. 1991) ("When corporations represent precisely the same single interest, the court is free to disregard their separate corporate identity. . . . This is especially true where the corporations constitute a single business. Courts have been unwilling to allow affiliated corporations that are not directly involved to escape liability simply because of the business fragmentation." (citations omitted)); *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 450–51 (Tex. 2008) (noting "[w]hen corporations are not operated as separate entities but rather integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for debts incurred in pursuit of that business purpose. Factors to be considered in determining whether the constituent corporations have not been maintained as separate entities include but are not limited to the following: common employees; common offices; centralized accounting; payment of wages by one corporation to another corporation's employees; common business name; services rendered by the employees of one corporation on behalf of another corporation; undocumented transfers of funds between corporations; and unclear allocation of profits and losses between corporations," but cautioning that "the limitation on liability afforded by the corporate structure can be ignored only when

unified their business operations and resources to achieve a common business purpose and where adherence to the fiction of separate corporate identities would defeat justice, courts have refused to recognize the corporations' separateness, instead regarding them as a single enterprise-in-fact, to the extent the specific facts of a particular situation warrant.

Although no other jurisdiction seems to use the term "amalgamation," other states have indeed recognized that, in some instances outside of the traditional veil-piercing context, certain enterprises choose to conduct their business in such a way that the law should no longer regard the various corporations as distinct entities.[6] Our research reveals that the underlying rationale for other states' decisions to treat various corporations as a single business entity varies; as one scholar has explained:

> [J]udicial erection of a new [aggregate enterprise] entity occurs in situations where the corporate personality (as embodied in its charter, books and so forth) does not correspond to the actual enterprise, but merely to a fragment of it. The result is to construct a new aggregate of assets and liabilities. Typical cases appear where a partnership or a central corporation owns the controlling interest in one or more other corporations, but has so handled them that they have ceased to represent a separate enterprise and have become, as a business matter, more or less indistinguishable parts of a larger enterprise. The decisions disregard the paper corporate personalities and base liability on the assets of the enterprise. The reasoning by which courts reach this result varies: it is sometimes said that one corporation has become

---

the corporate form has been used as part of a basically unfair device to achieve an inequitable result" (footnotes, quotation marks, and citations omitted)).

[6] *See* Stephen B. Presser, *The Bogalusa Explosion, "Single Business Enterprise," "Alter Ego," and Other Errors: Academics, Economics, Democracy, and Shareholder Limited Liability: Back Towards A Unitary "Abuse" Theory of Piercing the Corporate Veil*, 100 Nw. U. L. Rev. 405, 422–23 (2006) (noting the other jurisdictions which have "recognized the idea of imposing liability on or finding jurisdiction over a 'single business enterprise' involving multiple corporations called by that name or something similar" include Arkansas, California, Connecticut, Indiana, Louisiana, Massachusetts, Mississippi, New Jersey, New York, North Carolina, Puerto Rico, Texas, Virginia, and Washington).

a mere "agency" of another; or that its operations have been so intermingled that it has lost its identity; or that the business arrangements indicate that it has become a "mere instrumentality."

. . . .

This category of cases stands still more squarely on the foundation of economic enterprise-fact. The courts disregard the corporate fiction specifically because it has parted company with the enterprise-fact, for whose furtherance the corporation was created; and, having got that far, they then take the further step of ascertaining what is the actual enterprise-fact and attach the consequences of the acts of the component individuals or corporations to that enterprise entity, to the extent that the economic outlines of the situation warrant or require.

Adolf A. Berle, Jr., *The Theory of Enterprise Entity*, 47 Colum. L. Rev. 343, 348 (1947).

Indeed, at least fourteen states around the country recognize some sort of single business enterprise theory. *See* Stephen B. Presser, *The Bogalusa Explosion, "Single Business Enterprise," "Alter Ego," and Other Errors: Academics, Economics, Democracy, and Shareholder Limited Liability: Back Towards A Unitary "Abuse" Theory of Piercing the Corporate Veil*, 100 Nw. U. L. Rev. 405, 422–23 (2006) (noting other jurisdictions). It also appears virtually all of these states require evidence of some sort of injustice or abuse of the corporate form to warrant disregarding the distinct corporate entities and treating the businesses as a single enterprise. As the Texas Supreme Court has put it:

Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances. There must also be evidence of abuse, or . . . injustice and inequity. By "injustice" and "inequity" we do not mean a subjective perception of unfairness by an individual judge or juror; rather, these words are used . . . as shorthand references for the kinds of abuse, specifically identified, that the corporate structure should not shield—fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like. Such abuse is

necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a "bedrock principle of corporate law"—that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations.

Disregarding the corporate structure involves two considerations. One is the relationship between two entities . . . . The other consideration is whether the entities' use of limited liability was illegitimate.

*SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008). We agree with the reasoning of the Texas Supreme Court.

We formally recognize today this single business enterprise theory, and in doing so, we acknowledge that corporations are often formed for the purpose of shielding shareholders from individual liability; there is nothing remotely nefarious in doing that. For this reason, the single business enterprise theory requires a showing of more than the various entities' operations are intertwined. Combining multiple corporate entities into a single business enterprise requires further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions.

As with other methods of piercing the corporate form that have previously been recognized in South Carolina, equitable principles govern the application of the single business enterprise remedy, and this doctrine "is not to be applied without substantial reflection." *Drury Dev. Corp. v. Found. Ins. Co.*, 380 S.C. 97, 101, 668 S.E.2d 798, 800 (2008) (quoting *Sturkie v. Sifly*, 280 S.C. 453, 457, 313 S.E.2d 316, 318 (Ct. App. 1984)). "If any general rule can be laid down, it is that a corporation will be looked upon as a legal entity until sufficient reason to the contrary appears; but when the notion of legal entity is used to protect fraud, justify wrong, or defeat public policy, the law will regard the corporation as an association of persons." *Id.* "The party seeking to pierce the corporate veil has the burden of proving that the doctrine should be applied." *Id.*

Here, the trial court found amalgamation was proper because the three entities had the same shareholders and the same managing partner (Pertuis) who oversaw all three restaurants. The trial court also found "there had been considerable movement of corporate funds between the three corporate Defendants, for which Defendants did not produce any documentation in the record of this case," and

noted the three restaurants shared a website. The trial court also found the parties had disregarded corporate formalities, including shareholder and board of directors meetings, in addition to the conveyance of a boat from the Hammonds to Pertuis "without any corporate formality . . . to avoid liability and high insurance premiums." The trial court concluded: "Accordingly, this Court finds and concludes, applying the standards articulated in *Magnolia North Prop. Owners Ass'n v. Heritage Communities, Inc*., 725 SE2d 112, 397 SC 348 [sic] (Ct. App. 2012), that [the Hammonds] and [Pertuis] operated the three corporate Defendants as a *de facto* partnership of the corporate entities."

The court of appeals misconstrued both the trial court's holding and Petitioners' claims of error. Specifically, the court of appeals concluded that "amalgamation" and a "de facto partnership" were two separate legal concepts and that the trial court had found the three entities were a de facto partnership—not an amalgamated corporate entity. In affirming the trial court's purported de facto partnership finding, the court of appeals noted evidence that the three restaurants shared personnel (including Pertuis as general managing partner, who travelled to all three restaurants weekly) and that several emails among the parties referred to the relationship between Pertuis and the Hammonds as a "partnership."

We agree with Petitioners that the trial court's finding was one of amalgamation, despite its use of the phrase "de facto partnership," and we reverse the court of appeals.[7] Further, we find the trial court's analysis not only failed to assign the burden of proof to Pertuis, as the party seeking amalgamation, but also overlooked the corporations' status as S-Corporations, which are statutorily permitted to disregard the very corporate formalities identified by the trial court as lacking.[8] *See, e.g*., S.C. Code Ann. § 33-18-200 to -210 (authorizing elimination of the requirement of a board of directors); *Id*. § 33-18-220 (authorizing an S-Corporation not to adopt bylaws); *Id*. § 33-18-230 (authorizing an S-Corporation not to hold an annual meeting). The Hammonds' failure to strictly comply with corporate

---

[7] Although not raised by the parties, we note it is unclear under what circumstances, if any, this equitable veil-piercing remedy would be available or appropriate in an action among shareholders.

[8] *See* South Carolina Statutory Close Corporation Supplement, S.C. Code Ann. §§ 33-18-101 to -500 (2006).

formalities was expressly authorized by statute, and our thorough review of the extensive record yields no evidence of bad faith by the Hammonds. Thus, it was error to consider these three distinct corporations as a single business enterprise.[9]

Properly viewing these corporations as the three distinct entities they are, we further conclude that the internal affairs doctrine precludes consideration of any remaining issues as to the North Carolina corporations.[10] We therefore reverse the decision of the court of appeals and we vacate the trial court's decisions as they relate to Beachfront and Lake Point. Further, we affirm the finding that Pertuis is entitled to unpaid distributions from Front Roe, but we modify the amount awarded to $14,142, which removes the funds attributable to the North Carolina corporations and limits the award to include only funds attributable to the South Carolina corporation.

### B. Percentage of Pertuis's Shares in Front Roe

Petitioners further contend the court of appeals erred in affirming the trial court's award of a 7.2% ownership interest in Front Roe to Pertuis. We agree and reverse.

It is undisputed Pertuis never received any share certificates for his ownership interest in Front Roe. The corporation's tax returns from years 2005 through 2012 indicated that, from 2007 forward, Pertuis's ownership interest in Front Roe was 1%.[11] It is further undisputed that Pertuis's claim to a 10% ownership interest in

---

[9] In light of this disposition, we need not reach the issue of whether the court of appeals erred in affirming the trial court's finding that the locus of the "de facto partnership" was Greenville, South Carolina. *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (citation omitted) (explaining an appellate court need not address remaining issues when disposition of prior issue is dispositive).

[10] In light of this finding, we need not reach the issue of whether the court of appeals erred in affirming the trial court's finding of a $0 value for Beachfront. *Futch*, 335 S.C. at 613, 518 S.E.2d at 598.

[11] The trial court took judicial notice of I.R.C. § 6037, which requires a shareholder of an S-Corporation to notify the IRS if the information listed on the corporation's tax return is inaccurate. The parties further stipulated that Pertuis had received the requisite K-1 forms but had made no notification to the IRS of any inconsistencies.

Front Roe was tied to profitability benchmarks for that restaurant. Pertuis's reliance on e-mail exchanges with Mark Hammond are unavailing.

Pertuis testified that, as to the vesting schedule for his interest in Front Roe, Pertuis's ownership interest was based on certain unidentified profit margin goals; Pertuis explained, "There was an initial letter similar to form of this [sic] around a creative way to structure something. . . . It had a proposed way to do things going forward that we were going to solidify at a later date." However, Pertuis stated on direct examination:

> Q. And at any time did you have any clear understanding about what it was going to take for you to be vested in an increased amount of ownership in the River [restaurant operated by Front Roe]?
>
> A. No, I didn't have clarity on that other than that original document that was put together just kind of saying, hey, this is how we will structure [vesting.]

Pertuis further testified that he eventually became frustrated with the lack of details and approached the Hammonds about "formalizing our agreement with the vesting schedule at the River."

Pertuis relied upon a series of emails between Pertuis and Hammond in June 2009 regarding changes to Pertuis's compensation package. Specifically, Pertuis argued those emails constituted an offer by Hammond, a counteroffer by Pertuis, and an acceptance by Hammond. However, none of those emails referenced the specific profitability benchmark required for Pertuis to receive 10% ownership of Front Roe; rather, the purported "offer" and "counteroffer" both included language indicating the profit margin had not yet reached the set milestone—whatever it was.[12]

---

[12] Specifically, Hammond's email stated "If we go with [compensation] Option A, we will extend the original [vesting] timeline on the River into 2009 if the final numbers for 2008 fall short of what you need under the original agreement to get you to the 10% ownership across the board." Likewise, in his "counteroffer" email, Pertuis stated, "If I did not achieve 10% ownership in 2008, we will extend current program through 2009 in order to equalize current ownership across the board."

The only evidence in the record of the specific profit margin dollar amount required for Pertuis to achieve a 10% ownership interest was Hammond's testimony that Pertuis "was granted one percent for when Front Roe turned profitable . . . and then an additional nine percent once the company had a net operating profit of $500,000." There is no evidence in the record that Front Roe ever achieved a net operating profit of $500,000.

The trial court characterized the vesting schedule as "missing" and concluded that the unavailability of the document was the Hammonds' fault. The trial court further found that because the loss of this document was not attributable to Pertuis, as an equitable matter, "this disputed ownership issue [should be treated] as if there was a graduated vesting schedule in place, so that [Pertuis] had achieved 72% of the [$500,000] goal of 10% shareholding in [Front Roe], or 7.2% ownership of [Front Roe]." On that basis, the trial court concluded Pertuis's ownership interest in Front Roe was 7.2%. On appeal, the court of appeals affirmed, finding the trial court's equitable remedy was proper given that "[Pertuis] could not, himself, testify to the specific provisions in the missing vesting schedule."

This was error, for it erroneously shifted the burden of proof from Pertuis, as the plaintiff seeking to enforce the purported agreement, to the Hammonds. We therefore reverse. Even assuming a written stock agreement was unnecessary,[13] Pertuis failed to meet his burden of proving the existence of an oral agreement as to all the material terms of the contract—specifically including the required profit margin bench mark, which is perhaps the *most* material term.

The evidence in the record conclusively demonstrates that Pertuis's ownership share in Front Roe is 1%. The trial court determined the fair market value of Front Roe is $1,376,000. Accordingly, the cost of purchasing Pertuis's shares in Front Roe is $13,760. We affirm the balance of the court of appeals' decision pursuant to Rule 220, SCACR.

### III.

Based on the foregoing, we reverse the court of appeals findings as to

---

[13] *See Springob v. Univ. of S.C.*, 407 S.C. 490, 495, 757 S.E.2d 384, 387 (2014) ("[T]he Statute of Frauds requires that a contract that cannot be performed within one year be in writing and signed by the parties.").

amalgamation, "*de facto* partnership," and the award of 7.2% ownership interest in Front Roe to Pertuis.  We affirm as modified the court of appeals finding that Pertuis is entitled to unpaid shareholder distributions.  We vacate the court of appeals opinion to the extent it makes any findings as to Beachfront and Lake Point, the two North Carolina corporations, and we affirm the balance of the judgment of the court of appeals pursuant to Rule 220, SCACR.

**FEW, JAMES, JJ., and Acting Justice Arthur Eugene Morehead III, concur. HEARN, J., dissenting in a separate opinion.**

**JUSTICE HEARN:**  Respectfully, I dissent.  While I concur fully in the majority opinion's treatment of the percentage of Pertuis's share in Front Roe and in its discussion of the amalgamation or single business enterprise theory, I part company with the majority's decision to rule on the single enterprise theory; instead, I would remand to the trial court to analyze the evidence under the framework we established today and to make findings of fact on that issue.