**[J-103A-2020 and J-103B-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| RYAN FELL MORTIMER, | : | No. 37 MAP 2020 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court dated December 12, |
| | : | 2019 at No. 3583 EDA 2018 |
| v. | : | Affirming the Judgment of the |
| | : | Chester County Court of Common |
| | : | Pleas, Civil Division, entered |
| MICHAEL ANDREW MCCOOL, RAYMOND | : | November 30, 2018 at No. 2012- |
| CHRISTIAN MCCOOL, ESTATE OF | : | 10523-MJ. |
| RAYMOND R. MCCOOL AND MCCOOL | : | |
| PROPERTIES, LLC, | : | ARGUED:  December 2, 2020 |
| | : | |
| Appellees | : | |
| | | |
| RYAN FELL MORTIMER, | : | No. 38 MAP 2020 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court dated December 12, |
| | : | 2019 at No. 3585 EDA 2018 |
| v. | : | Affirming the Judgment of the |
| | : | Chester County Court of Common |
| | : | Pleas, Civil Division, entered |
| 340 ASSOCIATES, LLC AND MCCOOL | : | November 30, 2018 at No. 2012- |
| PROPERTIES, LLC, | : | 02481-IR. |
| | : | |
| Appellees | : | ARGUED:  December 2, 2020 |

**JUSTICE WECHT**                                    **DECIDED:  July 21, 2021**

In this case, we examine the doctrine of "piercing the corporate veil," an area "among the most confusing in corporate law."[1]  On March 15, 2007, Ryan Fell Mortimer was seriously and permanently injured when an intoxicated driver collided with her car. The driver recently had been served by employees of the Famous Mexican Restaurant ("the Restaurant") in Coatesville, Pennsylvania.  The owners of the Restaurant had a contractual management agreement with the owner of the Restaurant's liquor license ("the License"), Appellee 340 Associates, LLC.  The Restaurant was located in a large, mixed-use building owned by Appellee McCool Properties, LLC.  At the time of the injury, Appellees Michael Andrew McCool ("Andy") and Raymond Christian McCool ("Chris") were the sole owners of 340 Associates.  With their father, Raymond McCool ("Raymond"), they also owned McCool Properties.  In an underlying "dram shop action," Mortimer obtained a combined judgment of $6.8 million against 340 Associates and numerous other defendants.  Under the Liquor Code, 340 Associates as licensee was jointly and severally liable for Mortimer's entire judgment.   340 Associates had no significant assets beyond the License itself, and neither carried insurance for such actions nor was required by law to do so.

---

[1]      Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. CHI. L. REV. 89, 89 (1985).

Seeking to collect the balance of the judgment,[2] Mortimer commenced the instant litigation against 340 Associates, McCool Properties, Chris, Andy, and the Estate of Raymond, who died after the collision but before the commencement of this action.[3] Mortimer sought to pierce the corporate veil to hold some or all of the individual McCool defendants and McCool Properties liable for her judgment. To reach McCool Properties, the focus of this appeal, Mortimer wishes to avail herself of a doctrine, novel to Pennsylvania law, known variously as "single-entity," "enterprise," or "horizontal" liability, among other formulations.[4] The thrust of the doctrine is that, just as a corporation's owner or owners may be held liable for judgments against the corporation when equity requires, so may affiliated or "sister" corporations—corporations with common ownership, engaged in a unitary commercial endeavor—be held liable for each other's debts or judgments.

While we conclude that a narrow form of what we will refer to as "enterprise liability" may be available under certain circumstances, it cannot apply under the facts of this case.

---

[2] In a separate action, Mortimer obtained ownership of the License, which she sold for $415,000.

[3] For ease of reference, we refer to "Raymond" throughout.

[4] Even the terminology in this context is unsettled. What we call "enterprise liability" throughout this opinion elsewhere is referred to variously as "single-entity," "affiliate," "horizontal," or "identity" liability—and the "enterprise" term we prefer is also complicated by multiple recognized meanings. The parties and the courts below have tended toward "single-entity" terminology in this case. We by and large refer to "enterprise liability" throughout this opinion, which is as apt as any other and has the benefit of brevity.

## I.    Background[5]

### A.    The Corporations

In 2001, Chris, Andy (collectively "the Brothers"), and Charles O'Neill formed and registered TA Properties and 340 Associates as limited liability companies[6] with the Pennsylvania Department of State.  TA Properties was formed to acquire and hold real estate, including the Property, a six-story building containing twenty apartments as well as a convenience store and restaurant space on the first floor.  340 Associates was formed by the same three people to acquire and hold the License.

On June 22, 2001, 340 Associates applied to the Pennsylvania Liquor Control Board ("PLCB") to transfer the License from its then-owners.  On June 28, TA Properties acquired the Property from the same parties who owned the License.  The PLCB approved the transfer of the License to 340 Associates on March 25, 2002.  The former manager of the Restaurant located on the Property stayed on as manager.

In 2002, the Brothers bought out O'Neill's interests in both corporations. Thereafter, the Brothers' father, Raymond, became a one-third member of TA Properties. On December 12, 2002, 340 Associates submitted to PLCB a notice documenting O'Neill's departure from 340 Associates and indicating that the Brothers were the sole

---

[5]    Mortimer persistently disputes numerous material aspects of the factual account that follows.  But we decline to engage these challenges except in passing, relying for our account and analysis upon the trial court's findings—which, finding support in the record, we are bound to accept as true.  *See McShea v. City of Philadelphia*, 995 A.2d 334, 338 (Pa. 2010) (quoting *Triffin v. Dillabough*, 716 A.2d 605, 607 (Pa. 1998)) ("When this Court entertains an appeal originating from a non-jury trial, we are bound by the trial court's findings of fact, unless those findings are not based on competent evidence.").

[6]    The corporate parties that concern us in this case were formed in 2001 and 2004, respectively, and the collision occurred in 2007.  Thus, the governing statute at all relevant times was the Limited Liability Company Law of 1994, Act of Dec. 7, 1994, P.L. 703, No. 106, *codified as amended at* 15 Pa.C.S. §§ 8901, *et seq.* (repealed and replaced in 2016).

remaining members of 340 Associates. To similar effect, on January 1, 2003, the Brothers signed a new operating agreement for 340 Associates, which identified each as holding a 50% interest. PLCB acknowledged the change on April 10, 2003.

On March 17, 2004, McCool Properties was formed and registered as a limited liability corporation with the Pennsylvania Department of State. On June 1, 2004, Chris, Andy, and Raymond (collectively, "the McCools") signed an operating agreement indicating that they were the members of McCool Properties. Shortly thereafter, TA Properties transferred all of its assets, including the Property, to McCool Properties.

**B.      The Restaurant, the Collision, the First Trial, and the "PUFTA" Action**

The Restaurant's manager, whom 340 Associates retained when they acquired the License, took ill. 340 Associates then sought PLCB approval of a new manager, Nazario Tapia, whom the PLCB approved in October 2004. On December 17 of that year, Tapia and his wife executed complementary but distinct contracts with 340 Associates and McCool Properties. First, the Tapias entered into a management agreement with 340 Associates for the use of the License. The Tapias agreed to pay all expenses associated with the License. They also agreed to remit sales taxes collected upon food sales to 340 Associates, for 340 Associates to pass on to the taxing authority, and to reimburse 340 Associates for any expenses advanced in maintaining the License. Second, the Tapias signed a market-rate lease for the Restaurant with McCool Properties.

On the date of the 2007 collision, the Restaurant had no liquor liability insurance. In November of the same year, Mortimer initiated her dram shop action against ten defendants, including 340 Associates as licensee. On June 16, 2009, with the litigation still pending, 340 Associates entered into an agreement to transfer the License to

334 Kayla, Inc.—an entity with no apparent affiliations to the parties of any relevance to this appeal—in exchange for below-market consideration of $75,000, for which 340 Associates retained a note. Contemporaneously, 334 Kayla entered into a lease with McCool Properties for the Restaurant.

On October 4, 2009, Raymond died. On August 18, 2010, a jury awarded Mortimer $6.8 million in damages against ten defendants, including 340 Associates. Thereafter, Mortimer filed a separate and ultimately successful action under the Pennsylvania Uniform Fraudulent Transfers Act[7] ("PUFTA") against 340 Associates and 334 Kayla. Mortimer ultimately took possession of the License and sold it for $415,000— an order of magnitude shy of her outstanding judgment.

Mortimer then filed the two since-consolidated actions now before us, which sought to pierce 340 Associates' corporate veil to reach the assets of the McCools individually and McCool Properties.

### C. The Lower Courts' Decisions

As an entry point to discussing the lower courts' opinions, we begin with a brief review of the doctrine of piercing the corporate veil. "[T]here is a strong presumption in Pennsylvania against piercing the corporate veil."[8] "[A]ny court must start from the

---

[7]    *See* 12 Pa.C.S. §§ 5101-5110. A party violates PUFTA when "the creditor's . . . claim arose before the transfer, the debtor . . . made the transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor became insolvent as a result of the transfer." *Cunningham v. Cunningham*, 182 A.3d 464, 472 n.3 (Pa. Super. 2018).

[8]    *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995).

general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception."[9]

> Piercing the corporate veil is . . . a matter of equity, allowing a court to disregard the corporate form and assess one corporation's liability against another. The corporate veil will be pierced and the corporate form disregarded whenever justice or public policy demand, such as when the corporate form has been used to defeat public convenience, justify wrong, protect fraud, or defend crime.[10]

The corporate form thus may be disregarded "where rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless."[11]

In *Ashley*, we held that the corporate form may be disregarded "whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests."[12] And in *Lumax*, we cited favorably the Commonwealth Court's enumeration of factors relevant to the piercing inquiry: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs[,] and use of the corporate form to perpetrate a fraud."[13]

Though these principles scan well enough, they are themselves a veil of sorts, obscuring the difficulty of applying them predictably and fairly from one case to the next. Our Superior Court has observed that "there appears to be no clear test or settled rule in

---

[9]   *Wedner v. Unemployment Bd. of Review*, 296 A.2d 792, 794 (Pa. 1972).

[10]   *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1034-35 (Pa. 2018) (cleaned up).

[11]   *Village at Camelback Prop. Owners Ass'n, Inc. v. Carr*, 538 A.2d 528, 532-33 (Pa. Super. 1988) (quoting *Ashley v. Ashley*, 393 A.2d 637, 641 (Pa. 1978)).

[12]   *Ashley*, 393 A.2d at 641.

[13]   *Lumax*, 669 A.2d at 895 (quoting *Kaites v. Dep't of Envtl. Res.*, 423 A.2d 1148, 1151 (Pa. Cmwlth. 1987)).

Pennsylvania . . . as to exactly when the corporate veil can be pierced and when it may not be pierced"[14]—a lack of clarity that often arises with equitable doctrines, which resist reduction to prescriptive tests, tending by historical design toward holistic, case-by-case analyses. As two eminences famously have observed, "'Piercing' seems to happen freakishly. Like lightning, it is rare, severe, and unprincipled."[15]

After Mortimer presented her case-in-chief at the bench trial, the court entered nonsuit for Raymond because Raymond had no ownership interest in 340 Associates and therefore could not be held liable for 340 Associates' debts even if the veil was pierced. Mortimer opposed the nonsuit, contending that she had presented a factual issue regarding Raymond's interest in 340 Associates, but the court found that she was barred from doing so by collateral estoppel, because the issue had been litigated and resolved against Mortimer in the course of the PUFTA action.[16] Neither the propriety of the non-

---

[14] *Fletcher-Harlee Corp. v. Szymanski*, 936 A.2d 87, 95 (Pa. Super. 2007) (quoting *Adv. Tele. Sys., Inc. v. Com-Net Prof'l Mobile Radio. LLC*, 846 A.2d 1264, 1278 (Pa. Super. 2004)).

[15] Easterbrook & Fischel, *supra* n.1 at 89. The vagaries of piercing doctrine have spawned voluminous scholarship, much of which bemoans the uncertainty that dogs the doctrine everywhere. *See, e.g.*, Stephen B. Presser, *The Bogalusa Explosion, "Single Business Enterprise," "Alter Ego," and Other Errors: Academics, Economics, Democracy, and Shareholder Limited Liability: Back Towards a Unitary Abuse Theory of Piercing the Corporate Veil*, 100 Nw. U. L. Rev. 405, 412 (2006) ("It is usually understood that to pierce the corporate veil some sort of abuse is required, but there is no consensus on what constitutes 'abuse.'"); Kurt A. Strasser, *Piercing the Veil in Corporate Groups*, 37 Conn. L. Rev. 637, 637 (2005) ("Although there is near unanimity among the commentators that the present rules neither guide good decision-making nor produce consistent or defensible results, and there are many proposals for reform or abolition of the present law, one sees little discernable [*sic*] movement in the case law toward a better approach.").

[16] Collateral estoppel will bar a court from revisiting an issue decided in an earlier proceeding where it is identical to an issue decided in a prior action, the prior action culminated in a final judgment on the merits, the party to be estopped was (or was in privity with) a party to the prior action, and the party had a full and fair opportunity to

suit, nor the question of 340 Associates' ownership, is before us now, and notwithstanding Mortimer's continuing efforts to relitigate the question, we are bound by the trial court's determination that Raymond had no ownership interest in 340 Associates.

After the trial, the court rejected the remainder of Mortimer's veil-piercing claims against the Brothers and McCool Properties. In denying Mortimer's effort to impose liability upon the Brothers as owners of 340 Associates, the trial court applied the *Lumax* factors. First, it found that 340 Associates was not undercapitalized.[17] 340 Associates' legal and permissible purpose was to hold the License, a valuable asset that the owners effectively contributed to the corporation.

The trial court also found that the observance-of-corporate-formalities factor had little relevance, because few such formalities are imposed for the management of a limited liability company. Moreover, 340 Associates adhered to the formalities that Pennsylvania law requires. It "had a certificate of organization and an operating agreement, filed federal income tax returns, kept bookkeeping records, and maintained a separate bank account."[18] As well, it maintained the License in good standing.

---

litigate the issue in the prior action. *Rue v. K-Mart Corp.*, 713 A.2d 82, 84 (Pa. 1998). Mortimer maintained that Raymond's interest in 340 Associates was not essential to the ruling in PUFTA, and that she lacked a full and fair opportunity to litigate it. The trial court disagreed on both points, and explained its reasoning in detail. *See* Tr. Ct. Op. at 12-15.

[17]   This Court has not offered a clear definition of undercapitalization, but it necessitates in any event a relative assessment—on the United States Supreme Court's account, the adequacy of available capital "measured by the nature and magnitude of the corporate undertaking." *Anderson v. Abbott*, 321 U.S. 349, 362 (1944).

[18]   Tr. Ct. Op. at 19.

Third, the trial court found no substantial intermingling of corporate and personal affairs between the Brothers and 340 Associates. Mortimer claimed that "McCool Properties charged above market rent to [the managers of the Restaurant] and that the excess was attributable to a usage fee for the License."[19] But crediting the testimony of Appellees' experts, including that of former PLCB member, Patrick Stapleton, Esq., the trial court rejected this contention. The court found the rent that the Restaurant paid to McCool Properties to be consistent with market rates, and concluded that 340 Associates' decision to charge the Restaurant no usage fee for the License was neither improper nor unheard of. Mortimer also argued that the Brothers "used their personal resources or resources of McCool Properties to support 340 Associates by paying certain expenses, such as licensing or accounting fees."[20] But the trial court observed that owners contributing capital *into* a corporation is the opposite of the sort of conduct that tends to support piercing the veil. Ultimately, the court found "no evidence that funds belonging to 340 Associates were used for a purpose unrelated to 340 Associates."[21]

Fourth and finally, the trial court found that the corporate form was not used to perpetrate a fraud or other wrongful act. "The use of a separate business entity to hold a liquor license is an accepted practice" and is legal under Pennsylvania law.[22] The court observed that "[a] business structure that is permitted under the law does not defeat public

---

[19]  *Id*. at 20.

[20]  *Id*.

[21]  *Id*. at 21.

[22]  *Id*.

convenience, justify wrong or result in fraud."[23]  Although no party held liquor liability insurance, no Pennsylvania statute or regulation in the heavily regulated liquor industry requires such insurance.  And although that license's value did not exceed the damages, "[n]ot every business entity can pay its debts, but that does not mean there is fraud."[24]

Regarding Mortimer's effort to impose liability upon McCool Properties, the court noted that she advanced two different theories to establish McCool Properties' liability: (1) the alter ego theory and (2) enterprise liability.  The court correctly noted that alter ego theory applies "only where the individual or corporate owner controls the corporation to be pierced *and the controlling owner is to be held liable*."[25]  McCool Properties undisputedly held no ownership interest in 340 Associates, so McCool Properties could not be liable as 340 Associates' corporate alter ego.

In jurisdictions that embrace enterprise liability, the corporate veil can be pierced to hold one company liable for an affiliated company's debt.  Our Superior Court considered the theory in *Miners*, but declined to apply it, specifically because this Court had yet to adopt it.[26]  Mortimer cited a number of federal court decisions applying enterprise liability under Pennsylvania law, but the trial court noted that those courts

---

[23]     *Id*. at 22 (citing *Golden Gate Nat'l Senior Care LLC*, 194 A.3d at 1035).  In this, the court perhaps said too much.  Piercing doctrine *exists* because legally well-founded corporations can be abused in ways that adhere to the letter of the law but equity will not tolerate.

[24]     *Id*.

[25]     *See Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 695 (Pa. Super. 1998) (emphasis in original).

[26]     *See id*.

merely speculated that this Court eventually would embrace the theory. The court quoted

the following passage from a federal decision addressing the question:

> Following *Miners,* courts applying Pennsylvania law have been split on whether to consider single entity theory claims. Some courts have held that because the Pennsylvania Supreme Court has not recognized the single entity theory, it is not an avenue of liability available to plaintiffs. *See, e.g., Bouriez v. Carnegie Mellon Univ.,* No. 02–2104, 2005 WL 3006831, at *19-20 (W.D. Pa. Aug. 6, 2008); *E-Time Sys., Inc. v. Voicestream Wireless Corp.,* No. 01-5754, 2002 WL 1917697, at *12 (E.D. Pa. Aug. 19, 2002). Other courts have held that because the Pennsylvania Supreme Court has not explicitly foreclosed the use of the single entity theory, the theory can be pursued by plaintiffs. *See, e.g., Gupta v. Sears, Roebuck & Co.,* No. 07-243, 2009 WL 890585, at *2 (W.D. Pa. Mar. 26, 2009); *Ziegler v. Del. Cty. Daily Times,* 128 F.Supp.2d. 790, 794-96 (E.D. Pa. 2001). Still other courts have applied a single entity theory without discussing the *Miners* decision. *See Castle Cheese, Inc. v. MS Produce, Inc.,* No. 04-878, 2008 WL 4372856, at *32 (W.D. Pa. Sept. 19, 2008) (applying a "single entity" claim in which the plaintiff showed that "in all aspects of their business, the two corporations actually functioned as a single entity and should be treated as such"). Research reveals no court, however, applying Pennsylvania law which has found in favor of a plaintiff on a single entity claim.[27]

The trial court then analyzed Mortimer's claims under the five-part *Miners* test.

"Under [the enterprise] theory, two or more corporations are treated as one because of

[1] identity of ownership, [2] unified administrative control, [3] similar or supplementary

business functions, [4] involuntary creditors, and [5] insolvency of the corporation against

which the claim lies."[28] The court concluded that Mortimer failed to satisfy the standard

even if it applied because McCool Properties and 340 Associates did not have identical

---

[27] *Macready v. TCI Trans Commodities, A.G.*, Civ. 00-4434, 2011 WL 4835829, at *7 (E.D. Pa. Oct. 12, 2011) (footnote omitted); *cf. In re LMcD, LLC*, 405 B.R. 555, 564-65 (Bankr. M.D. Pa. 2009) (predicting that this Court "would likely adopt the 'single entity theory' . . . to prevent fraud or injustice").

[28] *Miners*, 722 A.2d at 695.

ownership; Raymond shared only in the former corporation. As well, each corporation was at all times managed and administered as an independent entity.[29]

Mortimer appealed to the Superior Court, where a unanimous three-judge panel affirmed the trial court's rulings in all respects.[30] Among other things,[31] the court agreed with the trial court that McCool Properties could not be liable as an "alter ego" because it held no ownership interest in 340 Associates. Turning to enterprise liability, the panel observed that, "[w]hile [Mortimer] may present a meaningful case that 340 Associates and McCool Properties should be treated as one entity, Pennsylvania has repeatedly refused to adopt the . . . 'single entity' theory of piercing the corporate veil."[32] The Superior Court declined to be the first Pennsylvania court to do so.[33]

---

[29]     *See* Tr. Ct. Op. at 12.

[30]     *Mortimer v. McCool*, 3583 & 3585 EDA 2018, 2019 WL 6769733 (Pa. Super. Dec. 12, 2019) (unpublished).

[31]     The court agreed with the trial court that Raymond was entitled to a non-suit by virtue of collateral estoppel arising from the PUFTA action. The court also agreed with the trial court that 340 Associates could not be pierced to reach the Brothers personally.

[32]     *Id.* at *17.

[33]     With that prefatory "may present a meaningful case" caveat, the Superior Court hinted at an inclination to grant limited relief if enterprise liability applied. The court then confirmed this impression, disagreeing with the trial court's application of the theory.

> We note . . . that the record supports a finding that McCool Properties received inflated rent from [334] Kayla (but not the Tapias) as camouflaged payment for the license—payment which otherwise would have been given to 340 Associates. [Citing evidence that 334 Kayla's rent was inflated for years.] McCool Properties thus not only received a benefit as a result of the fraudulent transfer of the License, but this cloaked payment was one that customarily would have been disbursed directly to 340 Associates as compensation for the License, if not for the fraudulent transfer. Therefore, if the "enterprise entity" or "single entity" theory of piercing the corporate veil were available in Pennsylvania, some of McCool Properties' assets would be accessible to [Mortimer]—specifically, the difference between the fair

Mortimer sought this Court's review of several issues. We granted review of only one: "Whether . . . the Supreme Court should adopt the 'enterprise theory' or 'single entity' theory of piercing the corporate veil to prevent injustice when two or more sister companies operate as a single corporate combine?"[34]

## II.    Discussion[35]

### A.    The Arguments

In pressing this Court to recognize enterprise liability, Mortimer leans heavily upon the Superior Court's decision in *Miners*, even though the Superior Court there spilled little ink discussing the test it proposed. She also cites federal decisions observing that enterprise liability is compatible with Pennsylvania law and speculating that this Court would adopt the doctrine.

As set forth above, the *Miners* court advanced a five-factor test, proposing to treat sibling corporations as an enterprise when they have (1) identity of ownership, (2) unity of control, (3) similar or supplemental business functions, (4) involuntary creditors, and

---

market rent for commercial space at the Property and the inflated rent paid to McCool Properties by Kayla as concealed payments for the License.

*Id*. at \*17 n.22. Be this as it may, this aspect of the case, whether it belonged more properly in the PUFTA action or here, has not been developed by Mortimer before this Court except insofar as she attempts to link it to the question of the adequacy of 340 Associates' capitalization for piercing purposes. Ultimately, the Superior Court's commentary on this point is immaterial to our analysis and disposition of this case.

[34]    *Mortimer v. McCool*, 263 A.3d 1043 (Pa. 2020) (*per curiam*).

[35]    Whether to recognize enterprise liability presents a question of law that we review *de novo*. The scope of our review is plenary. *Norton v. Glenn*, 860 A.2d 48, 52 (Pa. 2004).

(5) insolvency of the corporation against which the claim lies.[36]  Mortimer analyzes each

*Miners* factor in turn.

On the first element, identity of ownership, Mortimer continues to maintain that Raymond was an "equitable owner" of 340 Associates, including his contemporaneous inclusion as an owner in certain ledgers and tax returns—tax returns, it is worth noting, that the Brothers testified named Raymond in error, and that were later corrected by the corporation's accountant.[37]

---

[36]     *Miners*, 722 A.2d at 695.  The *Miners* court did not address the distinction between voluntary and involuntary creditors, but it looms large in case law and scholarship.  One court has observed that involuntary creditors are "those who did not rely on anything when becoming creditors. . . .  Tort victims are classic examples."  *In re LMcD*, 405 B.R. at 566 (citing, *inter alia*, Mary Elisabeth Kors, *Altered Egos: Deciphering Substantive Consolidation*, 59 U. PITT. L. REV. 381, 419 (1998)).  Voluntary creditors, by contrast, have the opportunity to investigate factors bearing upon their risk of loss before entering into a transaction with a corporate counterparty.  *Id.* (citing *East End Mem. Ass'n v. Egerman*, 514 So.2d 38, 44 (Ala. 1987)).  This has led some commentators to argue for the adoption of divergent approaches to piercing depending upon whether the creditor is voluntary or involuntary.  *See, e.g.*, Strasser, *supra* n.15, at 638 ("[A] new consensus is emerging in the commentary that limited liability may well not be justified in tort cases . . . ."); *see also* Franklin A. Gevurtz, *Piercing Piercing: An Attempt to Lift the Veil of Confusion Surrounding the Doctrine of Piercing the Corporate Veil*, 76 OR. L. REV. 853, 907 (1997) ("[O]ne must always focus on the reasons why the corporation was liable to contract creditors or tort victims in the first place.  For contract creditors, corporate liability is what the parties agreed; for tort victims the goal of liability is to internalize accident costs. . . .  The key to internalizing accident costs is insurance.  Hence, lack of insurance to cover reasonably foreseeable risks provides the primary grounds to pierce in favor of tort claimants.").

[37]     *See* Brief for Mortimer at 28.  To support the tax return contention, Mortimer cites, *inter alia*, Schedule K-1 membership allocation summaries for 340 Associates for 2003 through 2005 that indicate that Raymond had a one-third interest in 340 Associates.  However, she does not explain why the trial court had insufficient grounds to credit the Brothers' testimony that this reflected an error that was corrected upon discovery.  Mortimer also argues that the inception of 340 Associates owed entirely to funding from McCool Properties, rendering McCool Properties' three owners, including Raymond, equitable owners of 340 Associates.  *Id.* at 29.  The documents she cites comprise Raymond's putative 2004 transfer of an interest in 340 Associates to a revocable trust in his name, and photocopies of checks issued by McCool Properties to a bank and to

With regard to administrative control, Mortimer excerpts the trial court's observation that, even if Raymond performed duties for McCool Properties such as bookkeeping and communicating with the accountant, these did not "equate to control."[38] Mortimer disagrees: "Respectfully, [Raymond] performed most, if not all, of the administrative tasks while he was alive . . . . Had the McCool Brothers actually exercised any responsible oversight of the bar, then they could perhaps cite to that fact in their favor. But they admittedly did not."[39] In any event, Mortimer cites no legal authority to establish that Raymond transformed his outsider status relative to 340 Associates' ownership merely by performing administrative tasks for the corporation, or that the performance of administrative tasks is relevant to the question of control in the piercing (or any) context.

Mortimer then addresses whether the corporations' business dealings were "supplemental" within the meaning of *Miners*. She disputes the trial court's determination that "[t]he two businesses are not functionally part of one economic enterprise[;] one does not heavily control the other and their operations are not integrated."[40]

---

individuals that have no apparent bearing on the proposition for which they are cited. Without further context or development, we cannot credit Mortimer's claim. It is less than clear that these assertions were preserved for review. If they were, the trial court evidently rejected them *sub silentio*.

[38] *Id*. at 30 (quoting Tr. Ct. Op. at 11).

[39] *Id*.

[40] Tr. Ct. Op. at 11. Again challenging findings of fact, she adverts to the $151,240 liability alluded to above that 340 Associates owed to McCool Properties and her own expert's opinion that this demonstrated that McCool Properties advanced these funds to facilitate 340 Associates' purchase of the License. "This," she opines, "indicates the supplemental nature of these sister companies." Brief for Mortimer at 31. Her citations to the record include balance sheets from 2007 that sustain the related-entity debit and credit, respectively. But again she provides insufficient context to interpret them, or to understand how they prove that the trial court's findings of fact lacked support in contradictory evidence. In any event, it seems clear that, with respect to the Restaurant,

Mortimer contends that the trial court erred in finding that, because 340 Associates held a demonstrably valuable asset in the License at the relevant time, it was not insolvent. She notes that this Court, quoting PUFTA's predecessor statute concerning fraudulent conveyances, has held that "[a] person is insolvent when the present, fair, salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."[41]

After explaining why she should prevail under the *Miners* test, Mortimer turns finally to address why this Court should adopt enterprise liability in the first place. Among the cases she cites in this connection is *In re LMcD*, in which the United States Bankruptcy Court observed that the United States Court of Appeals for the Third Circuit, applying Pennsylvania law, had embraced "reverse" or "triangular piercing," in which the liability of one sister corporation runs first to the common owners and then from the owners to the sister corporation by reverse-piercing.[42]

---

the corporations supplemented each other, but that neither changes the fact that McCool Properties did a lot of unrelated business, nor is its effect on the *Miners* test self-evident.

[41]     *Id.* at 33 (quoting *Larimer v. Feeney*, 192 A.2d 351, 353 (Pa. 1963) (quoting Pennsylvania Uniform Fraudulent Conveyance Act, 39 P.S. § 354 (repealed))); *cf.* 12 Pa.C.S. § 5102 ("A debtor is insolvent if, at fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets."). Mortimer cites no authority to support importing a statutory definition of insolvency to stand in for undercapitalization in this context. Inasmuch as she uses insolvency as a stalking horse for undercapitalization, we need not pursue this question in detail to resolve this case because other considerations dictate the outcome. But we do not foreclose the prospect that foreseeable tort liability (and, relatedly, insurance coverage) may be a relevant consideration in assessing the adequacy of a corporation's capitalization for piercing purposes. *See* Gevurtz*, supra* n.36, at 888-96 (analyzing various considerations, including insurance coverage against tort liability, relevant to undercapitalization).

[42]     *In re LMcD,* 405 B.R. at 565.

Mortimer pivots next to the law of other jurisdictions. She cites, for example, Texas as one of fifteen states that have enshrined enterprise liability in some form.[43] But in the decision that Mortimer invokes, the Texas Supreme Court held that enterprise liability was incompatible with Texas statutory law.[44] Mortimer also cites cases from Indiana and South Carolina, jurisdictions that undisputedly recognize enterprise liability.[45] From these cases she derives more than a dozen factors pertinent to the application of enterprise liability, factors which she suggests militate in favor of granting her relief under enterprise liability here.

Appellees respond that enterprise liability jurisdictions employ "a haphazard patchwork of elements and factors that are inconsistently applied," illustrating the difficulties associated with applying enterprise liability.[46] In their view, this should

---

[43]    *See* Brief for Mortimer at 35-36 & n.13 (citing *SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008) and listing states). For her tally she cites the South Carolina Supreme Court's decision in *Pertuis v. Front Roe Rests., Inc.*, 817 S.E.2d 273 (S.C. 2018). *Pertuis*, in turn, cites a law review article to support its own count. *Id.* at 280 (citing Presser, *supra* n.15, at 422-23). Professor Presser, in turn, described his own list as encompassing "jurisdictions which have at least recognized the *idea* of imposing liability on or finding jurisdiction over a 'single business enterprise' involving multiple corporations." Presser, *supra* n.15, at 422-23 (emphasis added). Excluding federal decisions, non-binding as to state law, as well as courts that have used enterprise liability or related terminology only in the subsidiary-parent/"alter ego" context, our own research has revealed at least ten states that recognize some variation of enterprise liability, including (but not necessarily restricted to) *Alabama*, California, Colorado (as "horizontal piercing"), *Connecticut* (as the "identity rule"), *Indiana*, *Illinois*, *Louisiana*, Massachusetts, *North Carolina*, and *South Carolina*—with the high court endorsing the rule in the italicized states. On any account, fewer than a third of state courts have expressly adopted enterprise liability.

[44]    *SSP Partners*, 275 S.W.3d at 456.

[45]    *See* Brief for Mortimer at 35-38 (discussing, *inter alia*, *Reed v. Reid*, 980 N.E.2d 277 (Ind. 2012); *Pertuis, supra*;).

[46]    Brief for Appellees at 23.

discourage us from joining those jurisdictions. Appellees note that many of the factors recited by those courts, such as occupying the same address and using overlapping or identical officers and employees, "have nothing to do with improper conduct and are common in many small businesses that own 'sister companies.'"[47]

Moreover, Appellees continue, the Superior Court correctly found in the alternative that enterprise liability should not apply in this case. Even where enterprise liability is recognized, courts apply it sparingly. "Because society recognizes the benefits of allowing persons and organizations to limit their business risks through incorporation, sound public policy dictates that imposition of [enterprise] liability be approached with caution."[48]

Appellees note that, while "sister entities" generally are understood as two related entities that share the same parent, the putative sister corporations at issue in this case have distinct ownership groups, albeit with the Brothers common to both.[49] The *Miners* court held that enterprise liability would not apply in that case in part for that reason. Specifically, while each company in question was majority-owned by the same person, the remaining owners of each company differed, thus failing the identity-of-ownership test. To extend enterprise liability on the basis of the common owner to a sister corporation with no responsibility for the defendant would punish the non-common owners of the

---

[47]     *Id.*

[48]     *Id.* at 26 (quoting *Las Palmas Assoc. v. Las Palmas Ctr. Assoc.*, 1 Cal. Rptr.2d 301, 317 (Cal. Ct. App. 1991)).

[49]     *See id.* at 25; *see also* BLACK'S LAW DICTIONARY 418 (10th ed. 2014) (defining sister corporation as "[o]ne of two or more corporations controlled by the same, or substantially the same, owners").

sibling company deemed liable for the other's debts for conduct over which they had no control.

Appellees also echo the lower courts' findings with respect to the remaining *Miners* factors. Rejecting Mortimer's suggestion that 340 Associates and McCool Properties were formed to separate a unitary business undertaking into liability-minimizing silos (which in any event is not illegal *per se*), Appellees underscore that, at the time of the collision, McCool Properties owned not only the property that housed the Restaurant, but numerous other unrelated revenue-generating properties.

Regarding the claim that 340 Associates was undercapitalized, Appellees note that the "special purpose" of 340 Associates was to hold the liquor license. The limited cash flow and negligible capital reserve were in keeping with that legitimate purpose and did not conflict with any statutory and regulatory requirements. 340 Associates also contracted with the manager of the Restaurant to handle insurance and the financial aspects of running the Restaurant. And the License was worth approximately $300,000 at the time of the collision, an amount that rendered 340 Associates' capitalization anything but negligible.

Appellees turn next to corporate formalities. Although Pennsylvania law imposes very few requirements upon limited liability companies, the record established that 340 Associates and McCool Properties had separate operating agreements; maintained separate books and bank accounts; filed taxes separately; and had distinct revenue streams. Moreover, corporate formalities are relevant only where the lack of observance is associated with abuse of the corporate form.[50] Indeed, the Corporations Code itself

---

[50] Brief for Appellees at 35 (citing *Adv. Tel. Sys., Inc.*, 846 A.2d at 1272).

provides that '[t]he failure of a . . . limited liability company to observe formalities relating to the exercise of its powers or management of its activities and affairs is not a ground for imposing liability on a partner, member or manager of the entity for a debt, obligation or other liability of the entity."[51]

Appellees also dispute Mortimer's contention that 340 Associates and McCool Properties' corporate affairs were intermingled with each other's or with the McCool's personal affairs. In *Lumax*, Appellees note, this Court spoke not of intermingling *itself* as a basis for piercing; it is the "*substantial intermingling* of corporate and personal affairs and use of the corporate form to perpetuate a fraud" that will justify piercing.[52] But for a few instances in which the manager folded the sales tax that 340 Associates owed the state into the Restaurant's rent payment to McCool Properties, all monies were booked consistently with the separate functions of the corporations—and McCool Properties promptly remitted misdirected monies to 340 Associates. With regard to Mortimer's claim that the Restaurant's rent was inflated to divert compensation for the use of the License to McCool Properties, the trial court ultimately concluded otherwise.

Finally, Appellees examine Superior Court cases that support the trial court's rulings. To review just one example, in *Miller v. Brass Rail Tavern, Inc.*,[53] the Superior

---

[51]    15 Pa.C.S. § 8106. Although not directly relevant to the time of the collision, the 2016 Committee Comment to that section explains: "The doctrine of 'piercing the corporate veil' is well-established, and courts regularly (and sometimes almost reflexively) apply that doctrine to limited liability companies and other unincorporated entities. In the corporate realm, 'disregard of corporate formalities' is a key factor in the piercing analysis. In the realm of limited liability companies, that factor is inappropriate, because informality of organization and operation is both common and desired."

[52]    Brief for Appellees at 36 (quoting *Lumax*, 669 A.2d at 895) (our emphasis).

[53]    702 A.2d 1072 (Pa. Super. 1997).

Court affirmed the trial court's refusal to pierce a tavern's veil to reach its lone individual owner, despite the fact that the tavern's only valuable asset was the liquor license—financed by a note held by the owner. The owner had purchased the tavern as one among several structures on a property that also included an apartment building for $100,000. $75,000 was attributable to the property, with the balance belonging to the corporation, subject to a note for $24,500 and a monthly rent obligation. In effect, the tavern owned nothing free and clear. The trial court nevertheless determined that the tavern was not undercapitalized relative to its operations because the tavern business is primarily a pay-as-you-go operation without a need for substantial capital reserves. The trial court also concluded that some irregularities in the source of certain mortgage payments and employee compensation did not suffice to establish remediable intermingling of corporate affairs. The owner's accountant testified that the incorrect payments were identified and rectified by compensatory payments well in advance of the collision, and reflected inadvertent mistakes rather than misuse of the corporate form for personal benefit.

### B. Limited Liability and Piercing the Veil in Pennsylvania

"Incorporation . . . encourag[es] investment by enabling the risk averse to limit their risk of loss to their investment" in the corporate entity;[54] limiting liability through incorporation is not a bug of corporate law but its defining feature. To fulfill its purpose, "a corporation is an entity irrespective of, and entirely distinct from, the persons who own its stock."[55] But limiting liability necessarily distributes risk to others. It externalizes

---

[54]     Richard A. Posner, *The Rights of Creditors of Affiliated Corporations*, 43 U. CHI. L. REV. 499, 503 (1976).

[55]     *Commonwealth ex rel. Atty. Gen. v. Monongahela Bridge Co.*, 64 A. 909, 911 (Pa. 1906).

business costs by imposing them upon creditors, for example. It also externalizes the costs associated with involuntary judgment creditors, like Mortimer, who had no reason or opportunity to hedge against the risk of an unforeseeable encounter with a business entity that cannot satisfy a judgment exceeding its assets, leaving her without a remedy.

Consequently, such protection is not absolute. It comes with countervailing burdens designed to balance the public benefit with the social cost of limited liability.[56] We provided an apt account of these competing considerations in *Golden Oak Building and Loan Association v. Rosenheim*:

> The fiction of a corporation as an entity distinct from the aggregate of individuals [it comprises] was designed to serve convenience and justice. There is consequently an exception recognized wherever the rule is known, namely, that the fiction will be disregarded and the individuals and corporation considered as identical whenever justice or public policy demand it and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless. A court of equity does not take a skin deep view . . . . It looks to the substance of the transaction, not to its mere form or color and sees things as ordinary men do. . . . In an appropriate case this court will not hesitate to treat as identical the corporation and the individual or individuals owning all its stock and assets.[57]

---

[56] *Cf. Sams v. Redev. Auth. of City of New Kensington*, 244 A.2d 779, 781 (Pa. 1968) ("[O]ne cannot choose to accept the benefits incident to a corporate enterprise and at the same time brush aside the corporate form when it works to their (shareholders') detriment."). In *Sams*, partners sought to treat two parcels, owned by different entities of which they were sole common owners, as one for purpose of calculating damages arising from an exercise of eminent domain. This Court denied the requested relief, based upon the legal distinction between the two entities. Thus, albeit in a distinct context, this Court has recognized the risk of common owners attempting to gain advantage by exploiting a commonly-owned corporate enterprise. *Cf. Commonwealth v. Peters Orchard Co.*, 515 A.2d 550 (Pa. 1986) (denying agriculture business tax exemption for corporation that merely leased land to another corporation that operated a farm on the leased property).

[57] *Golden Oak Bldg. & Loan Ass'n v. Rosenheim*, 19 A.2d 95, 97 (Pa. 1941) (cleaned up); *cf.* Easterbrook & Fischel, *supra* n.1, at 109 ("The [veil-piercing] cases may be understood . . . as attempts to balance the benefits of limited liability against its costs.").

Once an individual, individuals, or an entity elect to establish a corporation to gain the benefits of that business form, "such persons and entities are not free to blur the lines of the capacity in which they act as it may suit them, and the courts must take care to maintain the necessary distinctions."[58] When an owner does otherwise, he effectively "pierces the corporate veil by intermingling . . . personal interests with the corporation's interests."[59] Understood in this way, it is not the courts who first decline to recognize the corporate form. Rather, when the shareholder derives improper personal gain or advantage by misusing the corporate form, the court may reach through the veil already torn by the owner's abuses.

Nonetheless, courts must tread lightly when called upon to pierce the veil, whatever the doctrinal basis. "Any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. Care should be taken on all occasions to avoid making the entire theory of corporate entity useless."[60] We have held that, whenever an owner or owners use control of a corporation to further their personal interests, the fiction of the separate corporate identity may be disregarded.[61] As noted, *supra*, the corporate form may be disregarded "whenever justice or public policy demand, such as when the corporate form

---

[58] *Patton v. Worthington Assocs., Inc.*, 89 A.3d 643, 649 (Pa. 2014).

[59] *College Watercolor Grp., Inc. v. William H. Newbauer, Inc.*, 360 A.2d 200, 207 (Pa. 1976); *see* Brief for *Amicus Curiae*, Product Liability Advisory Council, Inc. ("PLAC") at 12 ("The alter ego test properly respects the importance of the distinct corporate entity by premising veil piercing on the 'sanctity of the corporate structure' having already been violated.").

[60] *Lumax*, 669 A.2d at 895 (quoting *Wedner*, 296 A.2d at 794) (cleaned up).

[61] *See Ashley*, 393 A.2d at 641.

has been used to defeat public convenience, justify wrong, protect fraud, or defend crime."[62] Fraud in its narrow sense need not be shown; Pennsylvania courts will disregard the corporate form "whenever it is necessary to avoid injustice,"[63] and so long as "the rights of innocent parties are not prejudiced nor the theory of corporate entity rendered useless."[64] Oft-cited factors that might lead a court to disregard the corporate form in a given case include "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs[,] and use of the corporate form to perpetrate a fraud."[65]

But Pennsylvania case law has said very little about enterprise liability as such, and nothing definitive at that. In *Miners*, *supra*, the Superior Court, discerning that the trial court in that case had "seemingly applied the *single entity* theory of piercing the corporate veil,"[66] explained:

> Under that theory, two or more corporations are treated as one because of [1] identity of ownership, [2] unified administrative control, [3] similar or supplementary business functions, [4] involuntary creditors, and [5] insolvency of the corporation against which the claim lies. E. Latty, *Subsidiaries and Affiliated Corporations* § 7, at 5-40 (1936).[67]

---

[62]     *Golden Gate Nat'l Senior Care LLC*, 194 A.3d at 1035 (cleaned up); *cf.* Adolf A. Berle, Jr., *Enterprise Entity Theory*, 47 COLUM. L. REV. 343, 353 (1947) ("In effect, the courts look through the paper delineation to the actual enterprise; and then determine whether it is criminal, illegal, contrary to public policy, or otherwise bad (as the circumstances may be) for individuals to conduct that enterprise by any kind of organization.").

[63]     *Village at Camelback*, 538 A.2d at 533.

[64]     *Ashley*, 393 A.2d at 641.

[65]     *Lumax*, 669 A.2d at 895 (quoting *Kaites*, 529 A.2d at 1151).

[66]     *Miners*, 722 A.2d at 695 (emphasis in original).

[67]     *Id.*

The trial court in *Miners* found that one individual owned sixty percent each of the two sibling corporations, but that the remaining forty percent of each corporation was held by other, non-common owners, such that identity of ownership was missing. The court also observed that Miners did not appear to be an involuntary creditor. Thus, the court effectively found in the alternative that enterprise liability could not apply even if the doctrine was recognized in Pennsylvania.[68]

As a source of the test it proposed and briefly applied, the court cited only a 1936 treatise. While the test has some appeal, it contains components that are not necessary to a just implementation of enterprise liability. It is not clear, for example, whether *absolute* identity of ownership and control *must* inhere to justify holding affiliate corporations to account for each other's liabilities in the presence of sufficient equitable grounds for doing so.[69] Nor is it obvious that only involuntary creditors like tort plaintiffs should have the benefit of the doctrine while voluntary contractual creditors like commercial lenders should not, even if the equities in a given case may vary accordingly.[70] Nonetheless, perhaps for want of an alternative in Pennsylvania cases, all

---

[68] This Court denied allowance of appeal. *Miners, Inc. v. Alpine Equip. Corp.*, 745 A.2d 1223 (Pa. 1999) (*per curiam*).

[69] Arguably, it would confound the doctrine if diverting fractional interests in each sibling in an enterprise to straw-owners sufficed to preclude enterprise liability where it otherwise would apply.

[70] As discussed at length, *see supra* at 15 n.36, the theoretical distinction between the two classes of creditors has been remarked upon frequently. Involuntary creditors take their judgment debtors as they find them; they have no opportunity to seek information or negotiate terms. Conversely, if a commercial lender finds itself unable to collect on a debt due to corporate chicanery, the question arises whether greater diligence might have disclosed that risk before the transaction. *See Gevurtz, supra* n.36, at 859 (observing that when a contract debtor could have discovered his risk, piercing the veil

federal courts that have surveyed Pennsylvania law on this subject have assumed that, if this Court were to adopt enterprise liability, it would follow the *Miners* formulation.[71]

What is clear is that the enterprise liability doctrine's applicability, and the form it might take in Pennsylvania, remain unsettled. So we look to the methods employed by the handful of jurisdictions that have adopted the doctrine in some form.

## C.     Enterprise Liability in Other Jurisdictions

In at least ten states, courts clearly embrace the enterprise liability approach. For example, in *Hill v. Fairfield Nursing & Rehabilitation Center,*[72] the Alabama Supreme Court described a tangled web of corporations, all owned and controlled in equal shares by two individuals, which collectively operated numerous nursing facilities spanning several states, nearly all of them devoid of assets and un- or under-insured. The Alabama Supreme Court reversed summary judgment on enterprise liability and remanded for a trial in which application of the doctrine would be a matter for the jury.

---

would be a "windfall"). *But see* Easterbrook & Fischel, *supra* n.1, at 112 (noting that in the event of fraud, the distinction between tort and contract creditors "breaks down").

[71]     *See, e.g.*, *Wineburgh v. Jaxon Int'l, LLC*, Civ. 18-3966, ___ F. Supp.3d ___, 2020 WL 1986453 (E.D. Pa. April 27, 2020) (citing *Mortimer* and acknowledging that this Court has not adopted enterprise liability, but going on to note no identity of ownership and no involuntary creditor); *Atl. Hydrocarbon, LLC v. SWN Prod. Co., LLC*, 4:17-CV-02090, 2019 WL 928996, at *1 (M.D. Pa. Feb. 26, 2019) (unpublished) (no involuntary creditor); *Canfield v. Statoil USA Onshore Props. Inc.,* 3:16-0085, 2017 WL 2535941, at *9 (M.D. Pa. June 12, 2017) (unpublished) (no involuntary creditor); *J.B. Hunt. Transp. Inc. v. Liverpool Trucking Co., Inc.*, 1:11-CV-1751, 2013 WL 3208586, at *4-5 (M.D. Pa. June 24, 2013) (unpublished) (no involuntary creditor; no common ownership); *Macready*, 2011 WL 4835829, at *8 (unpublished) (no involuntary creditor); *see also In re Atomica Design Grp.*, 556 B.R. 125, 174-75 & n.34 (Bankr. E.D.Pa. 2016) (positing the adoption of the *Miners* factors, and that this Court would require strict identity of ownership).

[72]     134 So.3d 396 (Ala. 2013).

The Indiana Supreme Court also embraces enterprise liability. It begins with a generally applicable eight-factor piercing rubric, then proceeds to a secondary enterprise-specific inquiry, requiring resort to numerous additional, context-specific factors:

> While no one talismanic fact will justify with impunity piercing the corporate veil, a careful review of the entire relationship between various corporate entities, their directors and officers may reveal that such an equitable action is warranted. When determining whether a shareholder is liable for corporate acts, our considerations may include: (1) undercapitalization of the corporation, (2) the absence of corporate records, (3) fraudulent representations by corporation shareholders or directors, (4) use of the corporation to promote fraud, injustice, or illegal activities, (5) payment by the corporation of individual obligations, (6) commingling of assets and affairs, (7) failure to observe required corporate formalities, and (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form. In addition, when a plaintiff seeks to pierce the corporate veil in order to hold one corporation liable for another closely related corporation's debt, the eight [above] factors are not exclusive. Additional factors to be considered include whether: (1) similar corporate names were used; (2) the corporation shared common principal corporate officers, directors, and employees; (3) the business purposes of the organizations were similar; and (4) the corporations were located in the same offices and used the same telephone numbers and business cards. Further, a court may disregard the separateness of affiliated corporate entities when they are not operated separately, but rather are managed as one enterprise through their interrelationship to cause illegality, fraud, or injustice to permit one economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise. These single business enterprise corporations may be identified by characteristics such as the intermingling of business transactions, functions, property, employees, funds, records, and corporate names in dealing with the public.[73]

---

[73] *Reed*, 980 N.E.2d at 301-02 (Ind. 2012) (cleaned up). Similarly, The West Virginia Supreme Court has identified nineteen non-exhaustive factors that are relevant to piercing generally, even without the complications of single-entity liability, which West Virginia has not definitively adopted. *See Laya v. Erin Homes, Inc.*, 352 S.E.2d 93, 98-99 (W.V. 1986). Both *Reed* and *Laya* offer extreme examples of what Professor Gevurtz calls the "template" approach to assessing piercing claims, in which a court "either quotes or constructs a list of facts, which, in prior cases, accompanied decisions to pierce the corporate veil," and compares it to the case before it. Gevurtz, *supra* n.36, at 856-57 & n.13. He observes that "this sort of multi-factor approach carries tremendous indeterminacy," *id.* at 857, which subverts the purpose of enumerating factors. *See*

In stark contrast with Indiana's prescriptive methodology is Connecticut's more open-ended approach to enterprise liability, which it associates with an "identity rule" that it also uses to refer to alter ego liability.[74] "No hard and fast rule . . . as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case."[75]

> If plaintiff can show that there was such a unity of interest and ownership that the independence of the [affiliate] corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.[76]

Once again, the piercing inquiry is reduced to bedrock principles of equity.

Massachusetts similarly applies a less determined doctrine:

> Where there is common control of a group of separate corporations engaged in a single enterprise, failure (a) to make clear what corporation is taking action in a particular situation and the nature and extent of that action, or (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses, records, and finances,

---

Presser, *supra* n.15, at 426 (lamenting the "substitut[ion of] lists of factors for serious purposive analysis of when the veil should be pierced"). Louisiana intermediate appellate courts have compiled the greatest array of cases on enterprise liability, and serve as the principal focus of Professor Presser's article highlighting the dangers of applying a rubric that does not incorporate the threshold fraud or wrongful conduct requirement typical of traditional piercing doctrine. Louisiana courts cite as many as eighteen factors to determining when single-entity piercing may apply. *See GBB Props. Two, LLC v. Stirling Properties, Inc.*, 230 So.3d 225, 231 (La. Ct. App. 2017).

[74]   *Compare Zaist v. Olson*, 227 A.2d 552 (Conn. 1967) (sibling corporations), *with Toshiba Am. Med. Sys., Inc. v, Mobile Med. Sys., Inc.*, 730 A.2d 1219 (Conn. Ct. App. 1999) (parent-subsidiary).

[75]   *Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc.*, 447 A.2d 406, 411 (Conn. 1982) (quoting 1 Fletcher Cyclopedia of the Law of Corporations § 41.3 (1981)).

[76]   *Zaist*, 227 A.2d at 559 (cleaned up); *see Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326, 339 (Conn. 2010).

may warrant some disregard of the separate entities in rare particular situations in order to prevent gross inequity.[77]

The Massachusetts Supreme Judicial Court also has clarified that neither common ownership and control of two corporations nor the occupation of common premises alone warrants application of enterprise liability. Rather, some combination of those and other factors must establish "that an agency or similar relationship exists between the entities."[78] The court identified two classes of relevant factors: "active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another together with some fraudulent or injurious consequence of the intercorporate relationship."[79] The court held that enterprise liability did not apply because it could not determine a fraudulent or injurious consequence of the challenged behavior.

The Colorado Court of Appeals also has recognized piercing between commonly-owned subsidiaries—and also treats it as a doctrinal cousin of alter ego piercing. In *Dill v. Rembrandt Group, Inc.*,[80] that court validated but declined to apply what it called "horizontal piercing." In a thoughtful discussion, the court allowed in an appropriate case for a debtor of one corporation to enforce judgment against a sister corporation, provided that certain narrow conditions obtained. Essentially, a claimant seeking such relief would first have to establish, under Colorado's three-factor test, a basis for piercing the veil

---

[77]     *My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d 748, 752 (Mass. 1968).

[78]     *Westcott Const. Corp. v. Cumberland Const. Co., Inc.*, 328 N.E.2d 522, 525 (Mass. 1975). This language suggests that Massachusetts hews to the alter ego test.

[79]     *Id.* at 525 (cleaned up).

[80]     474 P.3d 176, 184 n.7 (Colo. Ct. App. 2020).

between the debtor corporation and the common owner. Then, employing reverse-piercing, the claimant would have to establish a basis for piercing the veil between the common owner and the sister corporation. The Colorado court utilized "alter ego" terminology, effectively translating the above framework into the requirement that the creditor must establish that both the debtor corporation and the sister corporation against whom relief was sought were alter egos of the common owners.[81]

In *Pertuis*, *supra*, the South Carolina Supreme Court "formally recognize[d]" the "single business enterprise theory," holding that the same equitable principles that guide the piercing inquiry generally should govern in the single-entity context.[82] However, it cautioned that "corporations are often formed for the purpose of shielding shareholders from individual liability [and] there is nothing remotely nefarious in doing that."[83] Like the foregoing courts, with the only possible exception of Louisiana,[84] the South Carolina Court left no doubt that enterprise liability would apply *only* in the event of fraud or other improper conduct relative to the administration of the corporations in question: "Combining multiple entities into a single business enterprise [for liability purposes] requires further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from

---

[81]    California's intermediate appellate courts have recognized the theory as well, deeming it closely related to California's "alter ego" theory. Enterprise liability may apply when there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist" and, "if the acts are treated as those of the corporation alone, an inequitable result will follow." *LSREF23 Clover Prop. 4, LLC v. Festival Retail Fund 1, LP*, 208 Cal. Rptr.3d 200, 212 (Cal. Ct. App. 2016).

[82]    *Pertuis*, 817 S.E.2d at 281-82.

[83]    *Id.* at 280.

[84]    *See supra* n.73.

the blurring of the entities' legal distinctions."[85]  "If any general rule can be laid down, it is that a corporation will be looked upon as a legal entity until sufficient reason to the contrary appears; but when the notion of legal entity is used to protect fraud, justify wrong, or defeat public policy, the law will regard the corporation as an association of persons."[86]

What we take from these cases is that, in multiple guises, most jurisdictions that recognize an enterprise liability variant also retain a requirement of wrongdoing and resultant injustice no less stringent than that which applies in any piercing case.[87]  They make clear that single-entity doctrine is not incompatible with traditional or alter ego veil-piercing.  Moreover, neither Appellees, their *amici*, nor any other authority we have reviewed supports the persistent suggestion that recognizing enterprise liability as part of

---

[85]     *Id.* at 280-81.

[86]     *Id.*  The North Carolina Supreme Court also has recognized enterprise liability, *see Glenn v. Wagner*, 329 S.E.2d 326 (N.C. 1985), as has the Illinois Supreme Court.  *See Main Bank of Chicago v. Baker*, 427 N.E.2d 94, 101 (Ill. 1981) ("The doctrine of piercing the corporate veil is not limited to the parent and subsidiary relationship; the separate corporate identities of corporations owned by the same parent will likewise be disregarded in an appropriate case.").

[87]     This undermines the predominant substantive argument of Appellees and their *amici* against enterprise liability.  *See* PLAC's Brief at 13 ("[S]ingle entity liability does not require that the corporate form . . . be disregarded, nor does it hold the owner . . . liable. . . .  The test articulated in *Miners* . . . does not turn on whether the joint owner of the two corporations used or misused either corporate form 'to defeat public convenience, justify wrong, protect fraud or defend crime.'"); *Amicus Curiae* Brief, Pennsylvania Builders Association, *et al.*, at 19 (observing that three of the five *Miners* factors are commonplace in closely related corporations, and that " none of the five factors consider whether an 'injustice' or 'abuse of corporate form' exist"); *see also* Brief for Appellees at 24 ("The *SSP Partners* court noted that the fundamental defect is that 'abuse and injustice are not components of the single entity theory.'  Courts applying the theory would be able to pierce the corporate veil for activities that are by no means illegal or fraudulent." (citation omitted)).  The triangular approach discussed below ensures not only that proving such disregard of the corporate form is required to overcome the bias in its favor, but also that a party seeking to establish enterprise liability as a basis for relief must prove at least twice-over what the alter ego plaintiff need prove only once.

piercing doctrine will transform the commercial environment for the worst. There is no evidence that scrupulous business owners have been punished anywhere for availing themselves of the option to distribute related businesses across multiple corporate entities to secure liability protection and legal advantage. Enterprise liability cases in which relief was granted seem to be very few and far between, and typically involve truly egregious misconduct.

## III. Enterprise Liability as a Salutary Complement to Pennsylvania Law

The creative utilization of compound business structures to secure various advantages is by now familiar. And with evolving uses of corporate liability protections came a growing body of law that evolved with the commercial environment. In 1947, Professor Berle gleaned the following incisive account of the philosophical basis for the enterprise liability doctrine from the growing body of cases addressing increasingly complex corporate combines:

> [T]he courts' rulings construct a new entity, this time out of spare parts distributed among component corporations. But they go further; and after disregarding the fictitious personality where it does not correspond with the enterprise, they outline an entity with a body of assets to which liabilities are assigned more nearly in accord with the ascertainable fact of the enterprise and its relationship to outsiders.

> In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise; and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it. The court thus has constructed for purposes of imposing liability an entity unknown to any secretary of state comprising assets and liabilities of two or more legal personalities; endowed that entity with the assets of both, and charged it with the liabilities of one or both. The facts which induce courts to do this are precisely the facts which most persuasively demonstrate that,

though nominally there were supposed to be two or more enterprises, in fact, there was but one.[88]

We must determine whether enterprise liability can be squared with, and serve as a salutary complement to, the principles that have shaped our own case law on veil-piercing—and, if so, what form it should take. As noted, *supra*, Appellees maintain that, were this Court to adopt the *Miners* factors, the concern for injustice that has defined piercing doctrine since its inception must necessarily disappear from the inquiry, punishing blameless corporations and owners for availing themselves of familiar and lawful modes of doing business. We are advised that we would undermine long-standing reliance interests, discourage business formation, encourage going concerns to move to a more favorable business environment in another state, and deter corporations from setting up shop in Pennsylvania.[89]

These are strawman arguments. Most, if not all, enterprise liability jurisdictions have merely supplemented, not supplanted, their existing piercing standard with additional, context-specific considerations to establish when a corporate enterprise warrants piercing as such, preserving the threshold inquiry for the presence of piercing-worthy conduct by controlling actors or alter egos. And nothing in *Miners* is to the

---

[88] Berle, *supra* n.62, at 349-50 (footnotes omitted).

[89] The United States Chamber of Commerce and its associated *amici* posit that "[u]pending decades of settled case law, disregarding the intent of the General Assembly, and adopting the enterprise or single entity theories of liability would harm Pennsylvania's business community." *Amici Curiae* Brief, Chamber of Commerce of the United States of America, *et al.*, at 31; *see id.* at 31-37 (speculating regarding a mass exodus of Pennsylvania corporations if we hold that exploitation of a corporate combine to perpetuate injustice is not *per se* shielded from liability by the employment of layered and tiered corporate affiliates). But it "upends" nothing to find, having never held otherwise, that enterprise liability applied with due restraint is harmonious with the piercing jurisprudence with which the bench, bar, and business community are familiar.

contrary. While the court might have been clearer on this point, its discussion, hypothetical in any event, is compatible with a restrained approach. And even if the *Miners* test suffered from that alleged flaw, we are not bound to that test. We may validate the prospect of a viable claim for enterprise liability while underscoring that the fundamental concern for its use only in cases of great injustice and inequity must remain the lodestar of piercing jurisprudence.

In this regard, we find value in the approaches of the South Carolina Supreme Court in *Pertuis*, and especially that of the Colorado Court of Appeals in *Dill*. As the *Dill* court explained, enterprise liability in its most logical form requires an alter ego component, and it is this that at least substantial common ownership ensures. The notion of affiliate corporations depends upon the premise that they are siblings—of common parentage. And the prospect of wrongdoing in that scenario depends upon the actions (or omissions) of the common owner to exploit limited liability while failing to observe the separation between the corporations.[90] Thus, enterprise liability requires that the affiliates that the enterprise comprises have common owners and/or an administrative nexus above the sister corporations. Without that nexus, piercing the veil to reach a sister corporation cannot be just.

---

[90] As Professor Gevurtz observes, reliance upon control or domination as a proxy for piercing-worthy wrongdoing tends to be "silly," especially for single-owner or small closely held corporations or corporate enterprises, where there is often unity or substantial overlap of operational control and governance without wrongdoing. *See* Gevurtz, *supra* n.36, at 864. More frequently, the use of control in these cases buttresses a finding of self-dealing. *Id.* at 875 ("[A]fter one strips away all the flak about formalities and domination, many piercing cases come down to a problem of self-dealing. Often, courts refer to 'siphoning' or 'commingling' as labels for this phenomenon." (footnotes omitted)).

Consequently, enterprise liability in any tenable form must run up from the debtor corporation to the common owner, and from there down to the targeted sister corporation(s). As set forth above, in this frame, enterprise piercing is aptly described as triangular. But this requires a mechanism by which liability passes through the common owner to the sibling corporation. This brings us to "reverse-piercing," which this Court has not had prior occasion to consider.[91]

In a reverse-piercing scenario, a claimant against the owner of a corporation must establish misuse of the corporate form to protect the owner's personal assets against some debt. As with enterprise liability, while this Court has never explicitly adopted reverse-piercing, we have never rejected it either.[92] To rule out reverse-piercing as a viable doctrine would be tantamount to saying either that it is not possible for a

---

[91] *See Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*, 926 F. Supp. 835, 840 n.12 (E.D. Ark. 1996) ("Conceptually, a triangular pierce results from a sequential application of the traditional piercing doctrine and the 'reverse piercing' doctrine . . . ."); *cf. In re Atomica*, 556 B.R. at 175 n.34 (citing *In re LMcD*, 405 B.R. at 565; *Nursing Home Consultants*, 926 F. Supp. at 840 n.12) ("The single entity theory has been compared to 'triangular piercing,' whereby one entity's liability are imposed first upon its shareholders through veil piercing and then upon a commonly owned corporation through 'reverse piercing.'"). The *Dill* court observed that among jurisdictions that recognize "horizontal piercing," *i.e.*, enterprise liability, only the Alabama Supreme Court has not expressly adopted reverse-piercing. *See Dill*, 474 P.3d at 184-85 (citing *Huntsville Aviation Corp. v. Ford*, 577 So. 2d 1281 (Ala. 1991)).

[92] *See Susquehanna Tr. & Inv. Co. v. Ansar Grp., Inc.*, 3442 EDA 2012, 2013 WL 11250980, at *6 (Pa. Super. Nov. 19, 2013) (unpublished) ("Our research confirms that a claim seeking to reverse pierce the corporate veil has yet to be recognized as a cause of action under Pennsylvania law."). As with enterprise liability, certain federal courts have speculated that this Court would embrace reverse-piercing in an appropriate case. *See, e.g.*, *Klein v. Weidner*, Civ. No. 08-3798, 2010 WL 571800, at *8 (E.D. Pa. Feb. 17, 2010) (applying reverse-piercing against a corporation to enforce judgment against a controlling member where the corporation "observed no formalities, its assets were routinely and overwhelmingly used to pay [the owner's] personal expenses, and the stated intention of the controlling member was to hide his assets from a judgment").

corporation's owner to use that corporation as a shield against personal liability by the creative movement of assets or liabilities between himself and the corporation, or that equity cannot reach such an event even when it happens.[93]  Pennsylvania courts' equitable powers should not be so constricted.

The heart of equity is broadly principled rather than narrowly axiomatic.  In *Weissman v. Weissman*, Justice Musmanno colorfully explained:

> [E]quity is to law what the helicopter is to aviation.  Equity can travel in any direction to achieve its objective of truth, and when it has found truth it can land on terrain which often would be utterly futile and unapproachable to formalistic law.  And on that terrain of ascertained fact, equity surveys the whole situation and grants the relief which justice and good conscience dictate.[94]

And so, too, we encounter (and sometimes experience) frustration with the imprecision of the law of piercing.[95]  But a rigidly formalistic approach only subverts the goal of equity. Instead, we must aspire by the geologic accumulation of cases in which we find narrow

---

[93]     *In re Mass*, 178 B.R. 626, 630 (Bankr. M.D. Pa. 1995) (noting that Pennsylvania courts have not precluded reverse-piercing; that equity exists "to prevent the triumph of defective legal form over a substance, which . . . otherwise merits redress"; and deeming reverse-piercing appropriate where, *inter alia*, the debtors "used the proceeds of the business as if they were the assets of the individual debtors themselves").

[94]     121 A.2d 100, 103 (Pa. 1956).

[95]     *See Fletcher-Harlee Corp.*, 936 A.2d at 95 (quoting *Adv. Tele. Sys., Inc.*, 846 A.2d at 1278) ("[T]here appears to be no clear test or well settled rule in Pennsylvania . . . as to exactly when the corporate veil can be pierced and when it may not be pierced."); *cf.* Berle, *supra* n.62, at 349-50 n.16 ("General phrases such as 'to do equity' are not very exact guides, especially where to do equity to one innocent party necessarily cuts into the equity of other equally innocent parties.").  *Amicus curiae* the Pennsylvania Association of Justice ("PAJ") also underscores the difficulties associated with these broadly-stated principles and argues that "there should be a clear test and settled rule" for veil-piercing. Brief for PAJ at 18.  Tellingly, PAJ then offers only that '[t]here should be no 'safe haven' in Pennsylvania jurisprudence for false pretense, fraud or injustice," *id.*, which, in fact, *is* the well-settled rule.  The issue isn't that there is no settled rule, it's that the rule is difficult to generalize.

answers in broad principles to guide the bar and the business community to anticipate the likelihood that piercing will apply in a given circumstance.[96]

The behavior that Pennsylvania courts have aimed to deter, and have sanctioned when necessary to prevent injustice, comes in many forms. Piercing law exists because it long has been recognized that an individual or corporation may abuse the corporate form directly, or vertically, by treating the corporation as a liability-free repository to protect funds from judgment during times of trouble, and in fairer conditions like a piggy bank for personal (or parent corporation) benefit. And it would be naïve to say that sister corporations in a larger enterprise with common owners cannot be used to similar effect, siloing the liabilities associated with a unitary business enterprise to dilute and minimize risk without honoring the concomitant restrictions upon corporations' interactions with owners, subsidiaries, and affiliates alike.

Unlike some jurisdictions, Pennsylvania has resisted the temptation to formalize the inquiry with an ever-increasing number of predefined factors embodying the many considerations that might aid in determining whether the corporate form has been abused, and we do not propose to change course now. If anything, simplicity is to be preferred. In this regard, Professor Gevurtz helpfully distills piercing jurisprudence to two dominant paradigms, the latter of which plainly resembles our own body of law. On this account, the inquiry reduces to a two-pronged test:

---

[96] *Cf. DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684 (4th Cir. 1976) ("The circumstances which have been considered significant by the courts in actions to disregard the corporate fiction have been rarely articulated with any clarity. Perhaps this is true because the circumstances necessarily vary according to the circumstances of each case, and every case where the issue is raised is to be regarded as *sui generis* to be decided in accordance with its own underlying facts." (cleaned up)).

First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and second, adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice. . . .

The second element . . . —that there be some fraud, wrong or injustice— seems to be nothing more than a restatement of the basic starting point that piercing is an equitable remedy used to prevent injustice. . . .[97]

Thus, Professor Gevurtz finds "wisdom in the traditional conjunctive formulation. The 'fraud or injustice' element tells the court *when* to pierce, the control element tells it *against whom.*"[98] Because fraud or injustice can be perpetrated by and through corporate combines, enterprise liability offers one possible answer to the question "*Against whom?*"

Turning to the instant case, the question, as formulated above, reduces to whether triangular piercing is warranted. This, in turn, requires at *least* substantially common ownership.[99] But the trial court found that Raymond was a full one-third owner of McCool Properties who held no interest in 340 Associates. And notwithstanding any administrative role Raymond may have played relative to 340 Associates, the record does not disclose that he exercised any meaningful control over 340 Associates' operations or management. Absent evidence that Raymond was implicated in any wrongful conduct, were enterprise piercing allowed in this case, his interests (or his estate's interests, if that

---

[97]    *Gevurtz, supra* n.36, at 862.

[98]    *Id.* at 866 (emphasis added).

[99]    We decline preemptively to rule out enterprise liability *per se* for want of perfect identity of ownership. It is not hard to imagine a scenario in which an owner of one entity in a corporate combine but not another has a *de minimis* interest, has invested little or none of his or her own resources, or has been made a straw-owner specifically to preclude enterprise liability. Similarly, where the corporation that the claimant seeks to reach by piercing the veil is owned by a subset of the owners of the debtor corporation, identity of ownership is lacking, but there may be no prejudice to the blameless owner of the debtor corporation who has no interest in the sister corporation.

estate remained open) would suffer tremendously by imposing liability upon McCool Properties in excess of $6 million. As we held in *Great Oak Building & Loan*, piercing may occur only "when the rights of innocent parties are not prejudiced thereby."[100]

Just as importantly, the trial court evidently found no basis upon which Mortimer could pierce the veil between 340 Associates and the Brothers individually as that corporation's owners; the court necessarily found that the Brothers maintained an appropriate separation between their personal interest and 340 Associates' corporate affairs and coffers. Because McCool Properties itself had no material ownership interest in, nor exercised any administrative control over, 340 Associates, the only path to its assets runs through the Brothers. If they were not individually blameworthy enough to warrant piercing, then the triangle won't close, and McCool Properties is insulated by the gap.

## IV. Conclusion

We are sensitive to the long history of thoughtful critiques of piercing doctrine generally, and of its various incarnations, and indeed that is why we have considered at such length a case that might have been resolved more curtly, with little benefit to Pennsylvania law. Yet we cannot help but notice that, while authors sometimes suggest that they possess some new manner of unpacking and reordering the jumble of time-worn bromides and case law into a more satisfying arrangement, what we typically find is the suggestion that courts replace one set of less-than-satisfying axioms that leave courts a great deal of discretion with another set of axioms that would do the same, shifting the

---

[100] *Great Oak Bldg. & Loan*, 19 A.2d at 97. Nor is Raymond the only one who might suffer. Were McCool Properties to be liable for millions of dollars, the interests of its creditors or tenants also might be prejudiced.

intellectual frame in which that discretion is exercised but failing to narrow the range of that discretion detectably. Whether the account is informed by economic theories, embraces novel abstractions, or simply offers a way to think about existing cases, the fact remains: our research discloses neither legal authority nor commentary that has proposed a way to ameliorate significantly the difficulties inherent in applying equitable principles to the ever-more-complex modern commercial environment.

We believe that our restrained, equitable posture toward veil-piercing cases has enabled Pennsylvania courts to do substantial justice in most cases,[101] and that there is no clear reason to preclude *per se* the application of enterprise liability in the narrow form described herein. That we have not had occasion to do so before now did not reflect any discernible disfavor; we simply have not accepted the question for review until now, and the lower courts' understandable reluctance to experiment with the doctrine by and large has denied us an occasion to do so. Here, for the foregoing reasons, that doctrine does not apply. But it remains for the lower courts in future cases to consider its application consistently with the approach described above, in harmony with prior case law, mindful of the salutary public benefits of limited liability, and with an eye always toward the interests of justice.

For the foregoing reasons, we affirm the Superior Court's ruling.

Chief Justice Baer and Justices Saylor, Todd, Donohue, Dougherty and Mundy join the opinion.

Justice Donohue files a concurring opinion in which Chief Justice Baer joins.

---

[101]     *Cf.* Strasser, *supra* n.15, at 642 ("There are no real signs that veil piercing is going away.").